403 U.S. 365 (1971)
GRAHAM, COMMISSIONER, DEPARTMENT OF PUBLIC WELFARE OF ARIZONA
v.
RICHARDSON ET AL.
No. 609.
Supreme Court of United States.
Argued March 22, 1971
Decided June 14, 1971[*]
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA.
Michael S. Flam, Assistant Attorney General of Arizona, argued the cause for appellant in No. 609. With him on the briefs were Gary K. Nelson, Attorney General, and James B. Feeley, Andrew W. Bettwy, Roger M. Horne, and Peter Sownie, Assistant Attorneys General. Joseph P. Work, Assistant Attorney General of Pennsylvania, argued the cause for appellants in No. 727. With him on the brief were Fred Speaker, Attorney General, Barry A. Roth, Assistant Deputy Attorney General, and Edward Friedman.
*366 Anthony B. Ching argued the cause and filed a brief for appellees in No. 609. Jonathan M. Stein argued the cause for appellees in No. 727, pro hac vice. With him on the brief were Harvey N. Schmidt and Jonathan Weiss.
Mr. Weiss filed a brief for the Legal Services for the Elderly Poor Project of the Center on Social Welfare Policy and Law as amicus curiae urging affirmance in No. 609. Robert A. Sedler and Melvin L. Wulf filed a brief for the American Civil Liberties Union as amicus curiae urging affirmance in both cases. Briefs of amici curiae urging affirmance in No. 727 were filed by Edith Lowenstein for Migration and Refugee Services, U. S. Catholic Conference, Inc., et al., and by Jack Wasserman and Esther M. Kaufman for the Association of Immigration and Nationality Lawyers.
MR. JUSTICE BLACKMUN delivered the opinion of the Court.
These are welfare cases. They provide yet another aspect of the widening litigation in this area.[1] The issue here is whether the Equal Protection Clause of the Fourteenth Amendment prevents a State from conditioning welfare benefits either (a) upon the beneficiary's possession of United States citizenship, or (b) if the beneficiary is an alien, upon his having resided in this country for a specified number of years. The facts are not in dispute.

I
No. 609. This case, from Arizona, concerns the State's participation in federal categorical assistance programs. These programs originate with the Social Security Act *367 of 1935, 49 Stat. 620, as amended, 42 U. S. C., c. 7. They are supported in part by federal grants-in-aid and are administered by the States under federal guidelines. Arizona Rev. Stat. Ann., Tit. 46, Art. 2, as amended, provides for assistance to persons permanently and totally disabled (APTD). See 42 U. S. C. §§ 1351-1355. Arizona Rev. Stat. Ann. § 46-233 (Supp. 1970-1971), as amended in 1962, reads:
"A. No person shall be entitled to general assistance who does not meet and maintain the following requirements:
"1. Is a citizen of the United States, or has resided in the United States a total of fifteen years. . . ."
A like eligibility provision conditioned upon citizenship or durational residence appears in § 46-252 (2), providing old-age assistance, and in § 46-272 (4), providing assistance to the needy blind. See 42 U. S. C. §§ 1201-1206, 1381-1385.
Appellee Carmen Richardson, at the institution of this suit in July 1969, was 64 years of age. She is a lawfully admitted resident alien. She emigrated from Mexico in 1956 and since then has resided continuously in Arizona. She became permanently and totally disabled. She also met all other requirements for eligibility for APTD benefits except the 15-year residency specified for aliens by § 46-233 (A) (1). She applied for benefits but was denied relief solely because of the residency provision.
Mrs. Richardson instituted her class action[2] in the District of Arizona against the Commissioner of the State's Department of Public Welfare seeking declaratory relief, an injunction against the enforcement of §§ 46-233 *368 (A) (1), 46-252 (2), and 46-272 (4), and the award of amounts allegedly due. She claimed that Arizona's alien residency requirements violate the Equal Protection Clause and the constitutional right to travel; that they conflict with the Social Security Act and are thus overborne by the Supremacy Clause; and that the regulation of aliens has been pre-empted by Congress.
The three-judge court upheld Mrs. Richardson's motion for summary judgment on equal protection grounds. Richardson v. Graham, 313 F. Supp. 34 (Ariz. 1970). It did so in reliance on this Court's opinions in Takahashi v. Fish & Game Comm'n, 334 U. S. 410 (1948), and Shapiro v. Thompson, 394 U. S. 618 (1969). The Commissioner appealed. The judgment was stayed as to all parties plaintiff other than Mrs. Richardson. Probable jurisdiction was noted. 400 U. S. 956 (1970).
No. 727. This case, from Pennsylvania, concerns that portion of a general assistance program that is not federally supported. The relevant statute is § 432 (2) of the Pennsylvania Public Welfare Code, Pa. Stat. Ann., Tit. 62, § 432 (2) (1968),[3] originally enacted in 1939. It provides that those eligible for assistance shall be (1) needy persons who qualify under the federally supported categorical assistance programs and (2) those other needy persons who are citizens of the United States. Assistance to the latter group is funded wholly by the Commonwealth.
*369 Appellee Elsie Mary Jane Leger is a lawfully admitted resident alien. She was born in Scotland in 1937. She came to this country in 1965 at the age of 28 under contract for domestic service with a family in Havertown. She has resided continuously in Pennsylvania since then and has been a taxpaying resident of the Commonwealth. In 1967 she left her domestic employment to accept more remunerative work in Philadelphia. She entered into a common-law marriage with a United States citizen. In 1969 illness forced both Mrs. Leger and her husband to give up their employment. They applied for public assistance. Each was ineligible under the federal programs. Mr. Leger, however, qualified for aid under the state program. Aid to Mrs. Leger was denied because of her alienage. The monthly grant to Mr. Leger was less than the amount determined by both federal and Pennsylvania authorities as necessary for a minimum standard of living in Philadelphia for a family of two.
Mrs. Leger instituted her class action[4] in the Eastern District of Pennsylvania against the Executive Director of the Philadelphia County Board of Assistance and the Secretary of the Commonwealth's Department of Public Welfare. She sought declaratory relief, an injunction against the enforcement of the restriction of § 432 (2), and the ordering of back payments wrongfully withheld. She obtained a temporary restraining order preventing the defendants from continuing to deny her assistance. She then began to receive, and still receives, with her husband, a public assistance grant.
Appellee Beryl Jervis was added as a party plaintiff to *370 the Leger action. She was born in Panama in 1912 and is a citizen of that country. In March 1968, at the age of 55, she came to the United States to undertake domestic work under contract in Philadelphia. She has resided continuously in Pennsylvania since then and has been a taxpaying resident of the Commonwealth. After working as a domestic for approximately one year, she obtained other, more remunerative, work in the city. In February 1970 illness forced her to give up her employment. She applied for aid. However, she was ineligible for benefits under the federally assisted programs and she was denied general assistance solely because of her alienage. Her motion for immediate relief through a temporary restraining order was denied.
It was stipulated that "the denial of General Assistance to aliens otherwise eligible for such assistance causes undue hardship to them by depriving them of the means to secure the necessities of life, including food, clothing and shelter," and that "the citizenship bar to the receipt of General Assistance in Pennsylvania discourages continued residence in Pennsylvania of indigent resident aliens and causes such needy persons to remove to other States which will meet their needs."
The three-judge court, one judge dissenting, ruled that § 432 (2) was violative of the Equal Protection Clause and enjoined its further enforcement. Leger v. Sailer, 321 F. Supp. 250 (ED Pa. 1970). The defendants appealed. Probable jurisdiction was noted. 400 U. S. 956.

II
The appellants argue initially that the States, consistent with the Equal Protection Clause, may favor United States citizens over aliens in the distribution of welfare benefits. It is said that this distinction involves no "invidious discrimination" such as was condemned in *371 King v. Smith, 392 U. S. 309 (1968), for the State is not discriminating with respect to race or nationality.
The Fourteenth Amendment provides, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It has long been settled, and it is not disputed here, that the term "person" in this context encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside. Yick Wo v. Hopkins, 118 U. S. 356, 369 (1886); Truax v. Raich, 239 U. S. 33, 39 (1915); Takahashi v. Fish & Game Comm'n, 334 U. S., at 420. Nor is it disputed that the Arizona and Pennsylvania statutes in question create two classes of needy persons, indistinguishable except with respect to whether they are or are not citizens of this country. Otherwise qualified United States citizens living in Arizona are entitled to federally funded categorical assistance benefits without regard to length of national residency, but aliens must have lived in this country for 15 years in order to qualify for aid. United States citizens living in Pennsylvania, unable to meet the requirements for federally funded benefits, may be eligible for state-supported general assistance, but resident aliens as a class are precluded from that assistance.
Under traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78 (1911); Williamson v. Lee Optical Co., 348 U. S. 483, 489 (1955); Morey v. Doud, 354 U. S. 457, 465 (1957); McGowan v. Maryland, 366 U. S. 420, 425-427 (1961). This is so in "the area of economics and social welfare." Dandridge v. Williams, 397 U. S. 471, 485 (1970). But the Court's decisions *372 have established that classifications based on alienage, like those based on nationality[5] or race,[6] are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a "discrete and insular" minority (see United States v. Carolene Products Co., 304 U. S. 144, 152-153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in Takahashi, 334 U. S., at 420, that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits."
Arizona and Pennsylvania seek to justify their restrictions on the eligibility of aliens for public assistance solely on the basis of a State's "special public interest" in favoring its own citizens over aliens in the distribution of limited resources such as welfare benefits. It is true that this Court on occasion has upheld state statutes that treat citizens and noncitizens differently, the ground for distinction having been that such laws were necessary to protect special interests of the State or its citizens. Thus, in Truax v. Raich, 239 U. S. 33 (1915), the Court, in striking down an Arizona statute restricting the employment of aliens, emphasized that "[t]he discrimination defined by the act does not pertain to the regulation or distribution of the public domain, or of the common property or resources of the people of the State, the enjoyment of which may be limited to its citizens as against both aliens and the citizens of other States." 239 U. S., at 39-40. And in Crane v. New York, 239 U. S. *373 195 (1915), the Court affirmed the judgment in People v. Crane, 214 N. Y. 154, 108 N. E. 427 (1915), upholding a New York statute prohibiting the employment of aliens on public works projects. The New York court's opinion contained Mr. Justice Cardozo's well-known observation:
"To disqualify aliens is discrimination indeed, but not arbitrary discrimination, for the principle of exclusion is the restriction of the resources of the state to the advancement and profit of the members of the state. Ungenerous and unwise such discrimination may be. It is not for that reason unlawful.. . . The state in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens rather than that of aliens. Whatever is a privilege rather than a right, may be made dependent upon citizenship. In its war against poverty, the state is not required to dedicate its own resources to citizens and aliens alike." 214 N. Y., at 161, 164, 108 N. E., at 429, 430.
See Heim v. McCall, 239 U. S. 175 (1915); Ohio ex rel. Clarke v. Deckebach, 274 U. S. 392 (1927). On the same theory, the Court has upheld statutes that, in the absence of overriding treaties, limit the right of noncitizens to engage in exploitation of a State's natural resources,[7] restrict the devolution of real property to aliens,[8] or deny to aliens the right to acquire and own land.[9]
*374 Takahashi v. Fish & Game Comm'n, 334 U. S. 410 (1948), however, cast doubt on the continuing validity of the special public-interest doctrine in all contexts. There the Court held that California's purported ownership of fish in the ocean off its shores was not such a special public interest as would justify prohibiting aliens from making a living by fishing in those waters while permitting all others to do so. It was said:
"The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide `in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." 334 U. S., at 420.
Whatever may be the contemporary vitality of the special public-interest doctrine in other contexts after Takahashi, we conclude that a State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify Pennsylvania's making noncitizens ineligible for public assistance, and Arizona's restricting benefits to citizens and longtime resident aliens. First, the special public interest doctrine was heavily grounded on the notion that "[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship." People v. Crane, 214 N. Y., at 164, 108 N. E., at 430. But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege." Sherbert v. Verner, 374 U. S. 398, 404 (1963); Shapiro v. Thompson, 394 U. S., at 627 n. 6; Goldberg v. Kelly, 397 U. S. 254, 262 (1970); Bell v. Burson, 402 U. S. 535, 539 (1971). Second, as the Court recognized in Shapiro:
"[A] State has a valid interest in preserving the fiscal integrity of its programs It may legitimately attempt to limit its expenditures, whether for public *375 assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens.. . . The saving of welfare costs cannot justify an otherwise invidious classification." 394 U. S., at 633.
Since an alien as well as a citizen is a "person" for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in Shapiro.
Appellants, however, would narrow the application of Shapiro to citizens by arguing that the right to travel, relied upon in that decision, extends only to citizens and not to aliens. While many of the Court's opinions do speak in terms of the right of "citizens" to travel,[10] the source of the constitutional right to travel has never been ascribed to any particular constitutional provision. See Shapiro v. Thompson, 394 U. S., at 630 n. 8; United States v. Guest, 383 U. S. 745, 757-758 (1966). The Court has never decided whether the right applies specifically to aliens, and it is unnecessary to reach that question here. It is enough to say that the classification involved in Shapiro was subjected to strict scrutiny under the compelling state interest test, not because it was based on any suspect criterion such as race, nationality, or alienage, but because it impinged upon the fundamental right of interstate movement. As was said there, "The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State *376 to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." 394 U. S., at 634. The classifications involved in the instant cases, on the other hand, are inherently suspect and are therefore subject to strict judicial scrutiny whether or not a fundamental right is impaired. Appellants' attempted reliance on Dandridge v. Williams, 397 U. S. 471 (1970), is also misplaced, since the classification involved in that case (family size) neither impinged upon a fundamental constitutional right nor employed an inherently suspect criterion.
We agree with the three-judge court in the Pennsylvania case that the "justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes and may be called into the armed forces. Unlike the short-term residents in Shapiro, aliens may live within a state for many years, work in the state and contribute to the economic growth of the state." 321 F. Supp., at 253. See also Purdy & Fitzpatrick v. California, 71 Cal. 2d 566, 581-582, 456 P. 2d 645, 656 (1969). There can be no "special public interest" in tax revenues to which aliens have contributed on an equal basis with the residents of the State.
Accordingly, we hold that a state statute that denies welfare benefits to resident aliens and one that denies them to aliens who have not resided in the United States for a specified number of years violate the Equal Protection Clause.

III
An additional reason why the state statutes at issue in these cases do not withstand constitutional scrutiny *377 emerges from the area of federal-state relations. The National Government has "broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." Takahashi v. Fish & Game Comm'n, 334 U. S., at 419; Hines v. Davidowitz, 312 U. S. 52, 66 (1941); see also Chinese Exclusion Case, 130 U. S. 581 (1889); United States ex rel. Turner v. Williams, 194 U. S. 279 (1904); Fong Yue Ting v. United States, 149 U. S. 698 (1893); Harisiades v. Shaughnessy, 342 U. S. 580 (1952). Pursuant to that power, Congress has provided, as part of a comprehensive plan for the regulation of immigration and naturalization, that "[a]liens who are paupers, professional beggars, or vagrants" or aliens who "are likely at any time to become public charges" shall be excluded from admission into the United States, 8 U. S. C. §§ 1182 (a) (8) and 1182 (a) (15), and that any alien lawfully admitted shall be deported who "has within five years after entry become a public charge from causes not affirmatively shown to have arisen after entry . . . ." 8 U. S. C. § 1251 (a) (8). Admission of aliens likely to become public charges may be conditioned upon the posting of a bond or cash deposit. 8 U. S. C. § 1183. But Congress has not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States. Rather, it has broadly declared: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ." 42 U. S. C. § 1981. The protection of this statute has been held to extend to aliens as well as to citizens. Takahashi, 334 U. S., at 419 n. 7. Moreover, this Court has made it clear that, whatever may be the *378 scope of the constitutional right of interstate travel, aliens lawfully within this country have a right to enter and abide in any State in the Union "on an equality of legal privileges with all citizens under non-discriminatory laws." Takahashi, 334 U. S., at 420.
State laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with these overriding national policies in an area constitutionally entrusted to the Federal Government. In Hines v. Davidowitz, 312 U. S., at 66-67, where this Court struck down a Pennsylvania alien registration statute (enacted in 1939, as was the statute under challenge in No. 727) on grounds of federal pre-emption, it was observed that "where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation . . . states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." And in Takahashi it was said that the States
"can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid." 334 U. S., at 419.
Congress has broadly declared as federal policy that lawfully admitted resident aliens who become public charges for causes arising after their entry are not subject to deportation, and that as long as they are here they are entitled to the full and equal benefit of all state laws for the security of persons and property. The state statutes *379 at issue in the instant cases impose auxiliary burdens upon the entrance or residence of aliens who suffer the distress, after entry, of economic dependency on public assistance. Alien residency requirements for welfare benefits necessarily operate, as did the residency requirements in Shapiro, to discourage entry into or continued residency in the State. Indeed, in No. 727 the parties stipulated that this was so.
In Truax the Court considered the "reasonableness" of a state restriction on the employment of aliens in terms of its effect on the right of a lawfully admitted alien to live where he chooses:
"It must also be said that reasonable classification implies action consistent with the legitimate interests of the State, and it will not be disputed that these cannot be so broadly conceived as to bring them into hostility to exclusive Federal power. The authority to control immigrationto admit or exclude aliens is vested solely in the Federal Government. . . . The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality." 239 U. S., at 42.
The same is true here, for in the ordinary case an alien, becoming indigent and unable to work, will be unable to live where, because of discriminatory denial of public *380 assistance, he cannot "secure the necessities of life, including food, clothing and shelter." State alien residency requirements that either deny welfare benefits to noncitizens or condition them on longtime residency, equate with the assertion of a right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible.

IV
Arizona suggests, finally, that its 15-year durational residency requirement for aliens is actually authorized by federal law. Reliance is placed on § 1402 (b) of the Social Security Act of 1935, added by the Act of Aug. 28, 1950, § 351, 64 Stat. 556, as amended, 42 U. S. C. § 1352 (b). That section provides:
"The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) of this section, except that he shall not approve any plan which imposes, as a condition of eligibility for aid to the permanently and totally disabled under the plan
.....
"(2) Any citizenship requirement which excludes any citizen of the United States."[11]
*381 The meaning of this provision is not entirely clear. On its face, the statute does not affirmatively authorize, much less command, the States to adopt durational residency requirements or other eligibility restrictions applicable to aliens; it merely directs the Secretary not to approve state-submitted plans that exclude citizens of the United States from eligibility. Cf. Shapiro v. Thompson, 394 U. S., at 638-641.
We have been unable to find in the legislative history of the 1950 amendments any clear indication of congressional intent in enacting § 1402 (b).[12] The provision appears to have its roots in identical language of the old-age assistance and aid-to-the-blind sections of the Social Security Act of 1935 as originally enacted. 49 Stat. 620, 42 U. S. C. § 302 (b); 49 Stat. 645, 42 U. S. C. § 1202 (b). The House and Senate Committee Reports expressly state, with reference to old-age assistance, that:
"A person shall not be denied assistance on the ground that he has not been a United States citizen for a number of years, if in fact, when he receives assistance, he is a United States citizen. This means that a State may, if it wishes, assist only those who are citizens, but must not insist on their having been born citizens or on their having been naturalized citizens for a specified period of time."[13]
*382 It is apparent from this that Congress' principal concern in 1935 was to prevent the States from distinguishing between native-born American citizens and naturalized citizens in the distribution of welfare benefits. It may be assumed that Congress was motivated by a similar concern in 1950 when it enacted § 1402 (b). As for the indication in the 1935 Committee Reports that the States, in their discretion, could withhold benefits from non-citizens, certain members of Congress simply may have been expressing their understanding of the law only insofar as it had then developed, that is, before Takahashi was decided. But if § 1402 (b), as well as the identical provisions for old-age assistance and aid to the blind, were to be read so as to authorize discriminatory treatment of aliens at the option of the States, Takahashi demonstrates that serious constitutional questions are presented. Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause. Shapiro v. Thompson, 394 U. S., at 641. Under Art. I, § 8, cl. 4, of the Constitution, Congress' power is to "establish an uniform Rule of Naturalization." A congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity.[14] Since "statutes should be construed whenever possible so as to uphold *383 their constitutionality," United States v. Vuitch, 402 U. S. 62, 70 (1971), we conclude that § 1402 (b) does not authorize the Arizona 15-year national residency requirement.
The judgments appealed from are affirmed.
It is so ordered.
MR. JUSTICE HARLAN joins in Parts III and IV of the Court's opinion, and in the judgment of the Court.
NOTES
[*] Together with No. 727, Sailer et al. v. Leger et al., on appeal from the United States District Court for the Eastern District of Pennsylvania.
[1] See, for example, King v. Smith, 392 U. S. 309 (1968); Shapiro v. Thompson, 394 U. S. 618 (1969); Goldberg v. Kelly, 397 U. S. 254 (1970); Rosado v. Wyman, 397 U. S. 397 (1970); Dandridge v. Williams, 397 U. S. 471 (1970); Wyman v. James, 400 U. S. 309 (1971).
[2] The suit is brought on behalf of appellee and similarly situated Arizona resident aliens who, but for their inability to meet the Arizona residence requirement, are eligible to receive welfare benefits under state-administered federal categorical assistance programs for the permanently and totally disabled, the aged, and the blind.
[3] "§ 432. Eligibility

"Except as hereinafter otherwise provided . . . needy persons of the classes defined in clauses (1) and (2) of this section shall be eligible for assistance:
"(1) Persons for whose assistance Federal financial participation is available to the Commonwealth . . . .
"(2) Other persons who are citizens of the United States, or who, during the period January 1, 1938 to December 31, 1939, filed their declaration of intention to become citizens. . . ."
[4] It was stipulated that the class of persons the appellees represent approximates 65 to 70 cases annually. This figure stands in striking contrast to the 585,000 persons in the Commonwealth on categorical assistance and 85,000 on general assistance. Department of Public Welfare Report of Public Assistance, Dec. 31, 1969.
[5] See Oyama v. California, 332 U. S. 633, 644-646 (1948); Korematsu v. United States, 323 U. S. 214, 216 (1944); Hirabayashi v. United States, 320 U. S. 81, 100 (1943).
[6] McLaughlin v. Florida, 379 U. S. 184, 191-192 (1964); Loving v. Virginia, 388 U. S. 1, 9 (1967); Bolling v. Sharpe, 347 U. S. 497, 499 (1954).
[7] McCready v. Virginia, 94 U. S. 391 (1877); Patsone v. Pennsylvania, 232 U. S. 138 (1914).
[8] Hauenstein v. Lynham, 100 U. S. 483 (1880); Blythe v. Hinckley, 180 U. S. 333 (1901).
[9] Terrace v. Thompson, 263 U. S. 197 (1923); Porterfield v. Webb, 263 U. S. 225 (1923); Webb v. O'Brien, 263 U. S. 313 (1923); Frick v. Webb, 263 U. S. 326 (1923); but see Oyama v. California, 332 U. S. 633 (1948).
[10] E. g., Passenger Cases, 7 How. 283, 492 (1849); Crandall v. Nevada, 6 Wall. 35, 48-49 (1868); Twining v. New Jersey, 211 U. S. 78, 97 (1908); Edwards v. California, 314 U. S. 160, 178-181 (DOUGLAS, J., concurring), 183-185 (Jackson, J., concurring) (1941); Shapiro v. Thompson, 394 U. S., at 629; Oregon v. Mitchell, 400 U. S. 112, 285 (opinion of STEWART, J.) (1970).
[11] Pursuant to his rulemaking power under the Social Security Act, 42 U. S. C. § 1302, the Secretary of Health, Education, and Welfare adopted the following regulations, upon which Arizona also relies:

"3720. Requirements for State Plans
"A State plan under titles I, X, XIV, and XVI may not impose, as a condition of eligibility, any citizenship requirement which excludes any citizen of the United States."
"3730. Interpretation of Requirement
"State plans need not contain a citizenship requirement. The purpose of IV-3720 is to ensure that where such a requirement is imposed, an otherwise eligible citizen of the United States, regardless of how (by birth or naturalization) or when citizenship was obtained, shall not be disqualified from receiving aid or assistance under titles I, X, XIV, and XVI.
"Where there is an eligibility requirement applicable to noncitizens, State plans may, as an alternative to excluding all noncitizens, provide for qualifying noncitizens, otherwise eligible, who have resided in the United States for a specific number of years." HEW Handbook of Public Assistance Administration, pt. IV.
[12] H. R. Rep. No. 1300, 81st Cong., 1st Sess., 53, 153-154; S. Rep. No. 1669, 81st Cong., 2d Sess.; H. R. Conf. Rep. No. 2771, 81st Cong., 2d Sess., 118-119.
[13] H. R. Rep. No. 615, 74th Cong., 1st Sess., 18; S. Rep. No. 628, 74th Cong., 1st Sess., 29.
[14] We have no occasion to decide whether Congress, in the exercise of the immigration and naturalization power, could itself enact a statute imposing on aliens a uniform nationwide residency requirement as a condition of federally funded welfare benefits.