Edward R. **JAGNANDAN** et al.,
Plaintiffs,

v.

William L. **GILES** et al., Defendants.

No. EC 73-9-K.

United States District Court,
N. D. Mississippi, E. D.

Aug. 15, 1974.

**1180**

Mark H. Shenfield, West Point, Miss., for plaintiffs.

Ed Davis Noble, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants.

Before COLEMAN, Circuit Judge, and KEADY and SMITH, District Judges.

KEADY, District Judge.

This class action was instituted by three resident aliens declared ineligible for resident status for tuition purposes at Mississippi State University. Plaintiffs and their purported class challenge the constitutionality of § 37–103–23, Miss.Code Ann. (1972) [1] which classifies alien students as nonresidents for the purpose of charging tuition and fees incident to attending a state-supported institution of higher learning. Defendants named in the complaint are William L. Giles, President of Mississippi State University, and William R. Nettles, Jr., Assistant to the Vice-President for Business Affairs at the University. The court, on its own motion, ordered that the Board of Trustees of the State Institutions of Higher Learning, the governing authority of Mississippi's senior colleges and universities, be joined as a party defendant needed for just adjudication. Rule 19(a), F.R.Civ.P.

Plaintiffs seek injunctive and declaratory relief and damages under 42 U.S.C. § 1983 for deprivation of rights, privileges and immunities secured by the Constitution and by 8 U.S.C. § 1101 et seq. Additionally, plaintiffs seek reasonable attorney fees. Jurisdiction is asserted under 28 U.S.C. § 1343(3) and (4).

Plaintiffs having sought to restrain the enforcement and application of a state statute upon the ground of federal unconstitutionality, a three-judge court, requisite under 28 U.S.C. §§ 2281 and 2284, was duly convened to hear and determine the action.

By agreement of the parties, the case is submitted upon a record which consists of stipulation of certain facts, affidavits and depositions. Defendants have raised certain defenses, including a Rule 12(b) motion to dismiss. The parties have, however, been afforded full opportunity to submit extensive memoranda on all questions raised by the pleadings and proof. Although the issues raised for decision are primarily of a legal nature, we first set forth the rel-

---

1. Although § 37–103–23 was formerly designated as § 6800–11(11), Miss.Code Ann. (Supp.1972), and is so referred to in the complaint, our reference will be to the 1972 recodification which took effect November 1, 1973.

evant facts which are largely undisputed.

The named plaintiffs are Edward R. Jagnandan and Leonard Susil Jagnandan, minors asserting their claims by their father, W. L. Jagnandan, who also prosecutes his individual claim. These persons are aliens and citizens of the Republic of Guyana (formerly British Guiana in South America). Plaintiffs lawfully entered the United States on or about July 31, 1969, and, although aliens, they are classified as permanent residents by the United States Immigration Service. Plaintiffs' unimpeached deposition testimony establishes that W. L. Jagnandan and his family in September 1969 voluntarily moved to Clay County, Mississippi, where they have since lived and maintained a household; that W. L. Jagnandan has been gainfully employed as Minister of Trinity Presbyterian Church at West Point, paying Mississippi State income taxes and also owning an automobile registered in Clay County. Edward and Leonard Jagnandan, both unmarried minors, resided in the family home. All three plaintiffs hold Mississippi drivers' licenses and regularly commuted 20 miles from their home to the university campus during school terms. Each plaintiff testified without reservation or qualification that he has no present intention of leaving the state, and his purpose is to reside indefinitely in Mississippi.

Edward R. Jagnandan and Leonard Susil Jagnandan enrolled as full-time students at Mississippi State University for the 1970 fall term. Upon the filing of this action on January 8, 1973, Edward was a University student in good standing; Leonard, although academically suspended in 1972, was eligible for probationary readmission in June, 1973.[2] Rev. Jagnandan entered the University in the 1972 spring semester as a candidate for a master's degree. He was thus in good standing as a "special student", having enrolled for less units than required of a full-time student.[3] At all pertinent times, general fees and tuition charges were separately established for resident and nonresident students, a higher rate ($300 more per semester) being required of nonresidents.

In September 1970, contemporaneous with the commencement of Edward's and Leonard's matriculations at the University, Rev. Jagnandan sought an appointment with University officials to establish his family's eligibility as state residents for tuition purposes. Pursuant to instructions, Rev. Jagnandan applied to Lynn D. Furgerson, the University's Director of Admissions and Registrar, setting up pertinent facts. Furgerson's adverse determination was reviewed and upheld by the Residency Appeals Committee, composed of faculty and staff members. This action was later approved by President Giles. Upon being notified that they were ineligible for resident tuition rates, plaintiffs sought no further administrative relief, and instituted this federal action.

The named plaintiffs contend that at all times during their attendance as university students, they were eligible to be deemed residents of Mississippi for tuition purposes but for their alien status. Miss.Code Ann. § 37–103–1 (1972) provides:

> "The board of trustees of each junior college in this state, the board of trustees of state institutions of higher learning, and the administrative authorities of each institution governed by said boards, in ascertaining and determining the legal residence of and tuition to be charged any student applying for admission to such institution shall be governed by the definitions and conditions set forth in Sections 37–103–1 to 37–103–23."

---

2. The record does not reflect whether Leonard reentered the University at the expiration of the probationary period.

3. Rev. Jagnandan's deposition indicates that in May 1973 he was awarded a master's degree from the University.

The relevant definition appears in § 37–103–23, which provides:

"All aliens are classified as nonresidents."

Plaintiffs thus maintain that the foregoing statutory requirement, on its face, violates rights, privileges and immunities secured to them by the Constitution as well as the laws of the United States. More specifically, plaintiffs urge that the state's statutory definition impinges on the constitutional right to equal protection and due process of law granted by the Fourteenth Amendment, as well as the rights to travel interstate and of free association guaranteed by Article IV, § 2 of the Constitution,[4] and the First, Fifth and Fourteenth Amendments. Plaintiffs also assert that the restriction placed by the challenged statute on aliens lawfully residing in Mississippi conflicts with the comprehensive and preemptive congressional scheme regulating the entry and residence of aliens in the United States imposed by 8 U.S.C. 1101 et seq.,[5] and required to be maintained inviolate by the Supremacy Clause in Article VI of the Constitution.[6]

The precise question for our decision is whether Mississippi, by § 37–103–23, can validly classify as nonresidents persons who are lawfully admitted aliens residing in Mississippi, and thereby exact higher tuition rates at the State's colleges or universities than are charged to citizens residing in the State. Several subsidiary matters, however, first must be considered.

■■■ Defendants, at the outset, challenge our jurisdiction under 28 U.S.C. § 1343, upon the premise that § 1343 pertains only to actions brought by citizens of the United States, and not aliens. This contention is wholly without merit, since it is a long-settled proposition that aliens lawfully in the United States are entitled to the protection of the Fourteenth Amendment. Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). Deprivation of rights secured under the Fourteenth Amendment, of course, gives rise to a cause of action in law, equity or other proceeding for redress by any citizen of the United States or other person within its jurisdiction. 42 U.S.C. § 1983. 28 U.S.C. § 1343(3), the jurisdictional counterpart of § 1983, confers original jurisdiction on a federal district court to determine civil actions of the aforementioned type. That plaintiffs are resident aliens and not citizens of the United States does not vitiate jurisdiction under § 1343. Dougall v. Sugarman, 339 F.Supp. 906 (3-judge court S.D.N.Y.1971), aff'd, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); Richardson v. Graham, 313 F.Supp. 34 (3-judge court 1970), aff'd, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Moreover, jurisdiction is properly conferred on this court by 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgments Act), and §§ 2281 and 2284 (Three-Judge Courts).

■■ Defendants also urge, as a jurisdictional challenge, that this suit is barred by the Eleventh Amendment which forbids any suit in federal court, in law or equity, against an unconsenting state by a citizen of any foreign state.[7] Unquestionably, the explicit lim-

---

4. Article IV, § 2, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

5. 8 U.S.C. § 1101 et seq. is a codification of the congressional statutes governing entrance and residence of aliens immigrating into the United States.

6. Article VI of the Constitution provides, inter alia:
"This Constitution, and the Laws of the United States which shall be made in Pursu-

ance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

7. Amendment XI—Suits Against States, provides:
"The Judicial power of the United States shall not be construed to extend to any suit

itations of the Eleventh Amendment on the jurisdiction of federal courts has been consistently reaffirmed and followed by the courts. Employees v. Missouri Public Health Dept., 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); Aerojet General Corp. v. Askew, 453 F.2d 819 (5 Cir. 1972). The Eleventh Amendment provides no immunity for defendants here, however, since this suit is clearly brought not against the State of Mississippi, but against two individuals (Giles and Nettles) and the members of a state board who allegedly are impermissibly acting under the mandate of a state statute in violation of plaintiffs' federal constitutional rights. Such a suit is permissible under the doctrine long ago established in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and ever since consistently adhered to by the Supreme Court. Having unassailable jurisdiction over the subject matter and the parties, this court may, in the event plaintiffs prevail on the merits, surely enjoin the enforcement of an unconstitutional statute. A more serious Eleventh Amendment issue concerns the scope of additional relief allowable to plaintiffs, a question on which we defer present discussion.

Before considering the merits, we next address the issue of whether the action is maintainable as a class action. The complaint (¶ 4) seeks to define the plaintiff class as follows:

"4. Plaintiff is a member of a class of persons who are alien residents lawfully residing as permanent residents of the United States and who reside in Mississippi and who have been declared ineligible for admittance into Mississippi State University as residents of Mississippi for tuition purposes solely because such

persons are not citizens of the United States."

■ Although class actions pursuant to Rule 23, F.R.Civ.P., have enjoyed widespread use in the field of civil rights litigation, such actions are certainly not without limitations imposed by both the Federal Rules of Civil Procedure and judicial decisions. In the case sub judice, we are unpersuaded that the action should proceed as a class action due to the failure of named plaintiffs to show that the requisite numerosity of class members exist under Rule 23(a)(1), and that their joinder is impracticable.[8]

The court first expressed concern as to the number of persons comprising the class defined in the complaint at a pretrial conference before the managing judge on June 1, 1973. The court then had before it the affidavit of Mr. Furgerson, the University Director of Admissions and Registrar, indicating that there were only six resident alien students, other than the three named plaintiffs, enrolled at the University from the September, 1970 semester, until May 1973, who were assessed nonresident tuition. In response to the court's concern as to this apparently small number, plaintiffs' attorney moved ore tenus for permission, which was granted, to reexamine and redefine the class. But, plaintiffs' counsel did not thereafter attempt to redefine the class, by amendment or other means; nor is there any material in the record, by way of affidavit or otherwise, that asserts that the purported class is larger than the six members specified in the Furgerson affidavit. Obviously, such a small number of persons is readily accessible to joinder.

The diminutive number of persons comprising the class is emphasized by the deposition testimony of Rev. Jagnan-

in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

8. Rule 23(a), F.R.Civ.P., provides, inter alia, that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, . . . "

dan (pp. 48–53), who stated that he knew of only three permanent-resident alien students, other than the named plaintiffs, who had attended Mississippi State at times pertinent to this suit.

The applicable standard in determining whether the conditions of Rule 23(a)(1) have been satisfied is succinctly stated in 7 Wright and Miller, Federal Practice and Procedure § 1762, p. 594, as follows:

> "Although the party instituting the action need not show the exact number of potential members in order to satisfy this prerequisite, he does bear the burden of showing impracticability and his mere speculation as to the number of parties involved is not sufficient. . . ." (Footnotes omitted).

■ Although the particular size of a class, even where of reduced numbers, is not necessarily the only factor that can weigh in favor of the propriety of a class action, Davy v. Sullivan, 354 F. Supp. 1320 (3-judge court, Ala.1973); Thomas v. Clarke, 54 F.R.D. 245 (D.C. Minn.1971); 7 Wright and Miller, Federal Practice and Procedure § 1763, p. 600, numerosity does remain a controlling consideration where neither the pleadings nor any evidence indicates the presence of other overriding considerations. This is particularly true where, as here, the size of the class is demonstrably small and all plain indications are that its alleged members could be joined without undue burden on plaintiffs. Ward v. Kelly, 476 F.2d 963 (5 Cir. 1973).

Plaintiffs' counsel, in a supplemental legal memorandum, urges us to interpret the class definition broadly by considering all resident aliens within Mississippi as members, or potential members, of the class. The argument is made that such aliens, who number more than 3,000, are appropriate members since they are inherently ineligible, by the broad sweep of § 37–103–23, for admittance as students with resident status at Mississippi State.

■ We reject plaintiff's contentions for two reasons. First, the named plaintiffs were granted leave to amend to redefine the class, but failed to do so. Second, even if plaintiffs' last minute interpretation were accepted, it would, in our view, constitute a class too indefinite in scope. DeBremaecker v. Short, 433 F.2d 733 (5 Cir. 1970). It is a fair conclusion from the Furgerson affidavit that very few aliens residing in Mississippi have sojourned in the state for the purpose of enrolling as students at Mississippi State. A well-settled rule of class actions is that the class description must be sufficiently definite. This principle is so stated in 7 Wright and Miller, § 1760, p. 581:

> "[T]he requirement that there be a class will not be satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. This means that the class must not be defined so broadly that it encompasses individuals who have little connection with the claim being litigated; rather, it must be restricted to individuals who are raising the same claims or defenses as the representative." (Footnotes omitted).

We hold that the named plaintiffs may be permitted to proceed on their individual claims only, and not as representatives of a class.

Addressing the merits of plaintiffs' individual claims, their most compelling argument is that the present case falls squarely within the holding of the Supreme Court in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and reiterated in Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), and In Re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L. Ed.2d 910 (1973).

In *Graham*, it was held that state statutes of Arizona and Pennsylvania denying welfare benefits to resident aliens or aliens who had not resided within the United States for a specified period of years were unconstitutional, as vi-

olative of the Equal Protection Clause. In reaching this conclusion, the court reaffirmed that an alien is a "person" within the meaning of the Equal Protection Clause,[9] and stated that classifications based on alienage are "inherently suspect" and subject to "close judicial scrutiny". The Court, speaking through Justice Blackmun, declared:

> "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." 403 U.S. at 372, 91 S.Ct. at 1852 (Footnotes and citations omitted).

Likewise, in Sugarman v. Dugall, supra, the Court, relying on *Graham's* reasoning, proclaimed that a state statute, which barred aliens from holding positions in the New York State competitive civil service system, was a denial of the equal protection guarantee. The Court, in *Griffiths*, again applying the *Graham* standard of review, struck down a Connecticut state-wide court rule, authorized by statute, which excluded aliens from admission to the practice of law.

■ Thus, plaintiffs submit that the rationale of *Graham* and its progeny are directly applicable to § 37–103–23, the statute under critical review. We are in full accord with plaintiffs' contentions. The classification created by § 37–103–23 indisputably imposes greater financial burden on alien students, who are bona fide residents of the State, to attend a Mississippi institution of higher learning solely because they are not citizens of the United States. Such a distinction is inherently suspect as violative of the Equal Protection Clause. Absent a compelling state interest to justify classification based on alienage, the statute must fail.

■ We are unpersuaded by defendants' suggestion that since education is not a fundamental or basic constitutional right, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the standard of strict judicial scrutiny is inapplicable. This position is demolished by settled doctrine, for a classification is subject to strict scrutiny where such classification is based on a suspect criterion like race, nationality, or, as here, alienage, *irrespective* of whether the classification impinges upon a fundamental or basic right. *Graham*, supra, 403 U.S. 365, 375–376, 91 S.Ct. 1848, 29 L.Ed.2d 534. It remains for us to examine critically the substantiality · of the state's purpose of interests in the enforcement of § 37–103–23. *Griffiths* was quite explicit regarding the state's burden to justify the use of a suspect classification, viz:

> "The Court has consistently emphasized that a State which adopts a suspect classification 'bears a heavy burden of justification,' McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964), a burden which, though variously formulated, requires the State to meet certain standards of proof. In order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary to the accomplishment' of its purpose or the safeguarding of its interest." at 413 U.S. 721, at 93 S.Ct. 2855, at 37· L.Ed.2d 915 (Footnotes omitted).

■ We perceive that defendants have,. by no means, met the burden of justifying the classification of all aliens residing in Mississippi as nonresidents for college tuition purposes. The strongest proffer of a compelling state purpose is the notion that § 37–103–23 represents

9. *The Fourteenth Amendment provided:* "[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."

a reasonable exercise of sound state economic policy, which has a direct bearing upon the allocation of limited funds for educational purposes. This proposition is the substantial equivalent of the "special public interest" plea which *Graham* rejected. Although not precisely articulated as such in the case sub judice, defendants' claim is that a state enjoys a "special public interest" in favoring its own citizens over aliens in the distribution of the benefits of higher education where economic resources to support a program of higher education are limited.

The Supreme Court in *Graham* emphasized that whatever interest a state may have to limit or condition expenditures or preserve the fiscal integrity of its programs, such considerations are inadequate to justify invidious discrimination against aliens. It held as follows:

"[A] State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify Pennsylvania's making noncitizens ineligible for public assistance, and Arizona's restricting benefits to citizens and longtime resident aliens. First, the special public interest doctrine was heavily grounded on the notion that '[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship.' But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or a 'privilege'. . . . Second, as the Court recognized in Shapiro: '[A] State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, *public education*, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. . . . The saving of welfare costs cannot justify an otherwise invidious classification.'

"Since an alien as well as a citizen is a 'person' for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in Shapiro." (Citations omitted). 403 U.S. at 374–375, 91 S.Ct. at 1853. (Emphasis added).

Hence, although defendants may be concerned with the strain of educational financing and budget balancing—concededly such considerations do bear a rational relationship between the classification and a legitimate state purpose—they nevertheless fall short of constituting compelling need for the State to justify the classification created by § 37–103–23. Most assuredly, this is not to say that aliens may not be subjected to any residency requirement whatever for tuition purposes, but only that Mississippi cannot permissibly draw a distinction between residency requirements imposed on the student who is a United States citizen and one who is a lawfully admitted alien. By state statute,[10] Mississippi permits a citizen to be admitted as a resident and become eligible for residency tuition rates at an institution of higher learning after he has continuously resided in Mississippi for a minimum of twelve months just prior to admission. It is precisely because § 37–103–23 mandates that lawfully admitted aliens may not be entitled to the same consideration after one year's uninterrupted Mississippi residency that the statute, on its face, creates an invidious discrimination and offends the Equal Protection Clause. The only admissible interpretation of § 37–103–23,[11] is that it applies to aliens as a class ("all aliens are classified as nonresidents"), and requires college of-

10. § 37–103–3. Twelve months' residency required before admission as resident of state.
"No student may be admitted to any junior college or institution of higher learning as a resident of Mississippi unless his residence has been in the State of Mississippi for a continuous period of at least twelve months immediately preceding his admission."

11. The section is one of fifteen statutes which regulate residency and fees of college students attending the State's educational institutions. § 37–103–1 to 37–103–29.

ficials to treat all noncitizens, whether resident or nonresident, alike for the purpose of imposing the higher, nonresident rate of tuition. Inasmuch as the statute allows no discretion whatever to the defendants in its application, *Graham* requires that we invalidate § 37–103–23 because of the explicit distinction which it impermissibly seeks to draw from the status of alienage.

Moreover, as applied to the plaintiffs, § 37–103–23 also violates the Due Process Clause of the Fourteenth Amendment. By its terms, the statute classifies as nonresidents *all* aliens wherever located and regardless of whether they may be, like the plaintiffs, aliens who are "lawfully admitted for permanent residence," [12] and are bona fide residents of Mississippi. That plaintiffs satisfy the residency criteria established by us in Cheek v. Fortune, 341 F.Supp. 729 (3-judge court, N.D.Miss.1972), is not open to question, yet the statute bars the plaintiffs from having opportunity to show what is true, i. e., that they do reside in Mississippi. The effect of the statute, as readily seen, erects an irrebuttable and conclusive presumption, for charging a higher rate of tuition applicable to only nonresidents, to persons who nevertheless are lawfully admitted aliens having indisputably established residence in the state. This result is violative of plaintiffs' due process rights under the teaching of Vlandis v. Kline, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63, 71, where the Supreme Court, by a 5 to 4 vote, held:

"In sum, since Connecticut purports to be concerned with residency in allocating the rates for tuition and fees at its university system, it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona fide resident entitled to the in-state rates. Since § 126 precluded the appellees from ever rebutting the presumption that they were nonresidents of Connecticut, that statute operated to deprive them of a significant amount of their money without due process of law."

Since our decision that the challenged statute is void because of conflict with the Fourteenth Amendment is dispositive of the case, we find it unnecessary to reach alternative claims of constitutional and statutory protection raised by plaintiffs. (Ante, footnotes 4–6). Only the scope of relief remains to be determined.

 Declaratory and injunctive relief to prevent future enforcement of § 37–103–23 against plaintiffs is, of course, appropriate; also, in the event the higher rate of tuition and fees for past semesters has not been collected from plaintiffs, payment thereof is excused. Plaintiffs seek damages, however, from defendants, including at least reimbursement for tuition and fees paid in excess of the amounts paid by resident students for the period of their enrollments. Such refunds were granted in *Vlandis* by the three-judge District Court of Connecticut, 346 F.Supp. 526; and the Supreme Court affirmed without out reference to the Eleventh Amendment.

 *Vlandis* would be conclusive if it were not for the recent decision of Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974), holding that the Eleventh Amendment barred a federal district court in Illinois from or-

12. 8 U.S.C. § 1101(a)(20) : "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." (See also 8 U. S.C. §§ 1151(a) and 1153(h)).

dering state officials to remit AABD benefits wrongfully withheld from eligible welfare applicants. The majority, in an opinion by Justice Rehnquist, drew a clear distinction between a money demand against a state payable out of its general revenues as falling within the Eleventh Amendment's ban, absent effectual waiver of immunity, and a demand for prospective equitable relief to deter future unconstitutional conduct by state officials, and explicitly decided that only the latter is permissible under the Ex Parte Young rationale. It is most pertinent that the Court disapproved the disposition of the Eleventh Amendment issue by its previous decisions which had summarily upheld lower federal courts ordering a state to make retroactive payments. *Edelman,* supra, 415 U.S. at 670, 94 S.Ct. at 1359, 39 L. Ed.2d at 676–677, fn. 13. It is in that light that we must construe *Vlandis'* affirmance, summarily ordering a refund of excess tuition without mention of the Eleventh Amendment. Unquestionably, the defendant university officials were under a statutory duty to charge plaintiffs the higher rate of tuition prescribed for nonresidents by the pertinent regulations; defendants were not unilaterally engaging in unconstitutional conduct not sanctioned by state law, or otherwise acting outside obligations imposed upon them by Mississippi statutes. Nor is there any question but that the refunds, if ordered, would not be paid by the defendants from personal funds, but would necessarily be a charge upon the state treasury, or at least that portion of the fisc dedicated to higher education. The suit, although nominally against State University officials, is in reality against the State of Mississippi. Ford Motor Co. v. Department of Trea-

sury, 323 U.S. 459, 65 S.Ct. 347, 89 L. Ed. 389 (1945).[13] It is certainly true that plaintiffs have paid to defendants, as unlawful exactions, excess tuition charges, which are readily ascertainable and modest in amount, and that such funds once belonged to plaintiffs.[14] Nonetheless, the size of the demand, whether large or small, can play no role in the applicability of the State's immunity, and the result of inequity, even of unjust enrichment, cannot invoke federal judicial power withheld by the Constitution. That an inequity may result from a court's failure or inability to restore to a party money which he paid to the State pursuant to an unconstitutional exaction does not remove the case from the Eleventh Amendment. Presumably, under such circumstances it is up to the state to provide or not provide, as it may choose, some means—whether administrative, judicial or legislative—for granting monetary relief to persons harmed by the state's unconstitutional actions. This explication is clearly made in *Edelman,* by its adherence to *Ford Motor Co.,* a 1945 decision, in these words:

> "There a taxpayer, who had, under protest, paid taxes to the State of Indiana, sought a refund of those taxes from the Indiana state officials who were charged with their collection. The taxpayer claimed that the tax had been imposed in violation of the United States Constitution. The term 'equitable restitution' would seem even more applicable to the relief sought in that case, since the taxpayer had at one time had the money, and paid it over to the State pursuant to an allegedly unconstitutional tax exaction. Yet this Court had no hesitation in holding that the taxpayer's action was

13. The Court, in Ford Motor Co., at 323 U. S. 464, at 65 S.Ct. 350, at 89 L.Ed. 394, said:

"[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."

14. At the request of the court, defendants advise that the total nonresident tuition collected from plaintiffs is $3,495 allocated as follows: Edward R. Jagnandan, $1,200; Leonard Susil Jagnandan, $1,500; and Rev. W. L. Jagnandan, $795.

a suit against the State, and barred by the Eleventh Amendment. We reach a similar conclusion with respect to the retroactive portion of the relief awarded by the District Court in this case." 415 U.S. 668, 94 S.Ct. 1358, 39 L.Ed.2d 676.

Although the lower courts in *Edelman* found an impermissible conflict existed between the AABD federal regulations and those adopted by Illinois, and not a Fourteenth Amendment violation, the sweep of the majority opinion apparently leaves no room for distinguishing money demands made against a state because of Fourteenth Amendment transgressions, at least in such areas, as here, where Congress had not passed enforcement legislation specifically directed against a state or states pursuant to Section 5 of the Amendment. We note that the plaintiffs in Ford Motor Co. v. Department of Treasury, 141 F.2d 24 (7 Cir. 1944), raised constitutional challenges (burden on interstate commerce) which were decided adversely to the plaintiff, but this judgment was vacated for want of federal judicial power. Without specific guidance from the Supreme Court, we hold that the issue of ordering refunds to plaintiffs is foreclosed and no longer an open question, despite the footnote observation in Justice Marshall's dissent.[15]

It follows that the judgment of this court shall be limited to granting declaratory and injunctive relief against further enforcement of the void statute and not require repayment of the excess tuition and other charges heretofore unconstitutionally exacted of the named plaintiffs.

■ As regards an attorney's fee sought by plaintiffs, the case is not one of such exceptional circumstances to justify allowance. The facts in no way establish that the defendants have committed acts which amount to unreasonable and obstinately obdurate conduct in the denial to the three plaintiffs of their constitutional rights. Neither may plaintiffs and their counsel be properly regarded as "private attorney generals" since their suit does not vindicate important congressional policies. Instead the defendant university officials have in good faith endeavored to comply with a statute previously unchallenged by anyone. Since neither basis which federal courts have alternatively employed in civil rights cases to award counsel fees is present here,[16] we decline to award attorney fees to plaintiffs, either as a measure of relief or as incidental costs.

---

15. Fn. 2. "It should be noted that there has been no determination in this case that state action is unconstitutional under the Fourteenth Amendment. Thus, the Court necessarily does not decide whether the States' Eleventh Amendment sovereign immunity may have been limited by the later enactment of the Fourteenth Amendment to the extent that such a limitation is necessary to effectuate the purposes of that Amendment, an argument advanced by an amicus in this case." 415 U.S. at 694, 94 S.Ct. at 1371, 39 L.Ed.2d at 690.

16. Jinks v. Mays, 464 F.2d 1223 (5 Cir. 1972) (enunciating unreasonable and obdurately obstinate standard), and Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (enunciating the private attorney general concept).