**Andrea LIEGGI, Petitioner,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 74 C 1641.**

United States District Court, N. D. Illinois, E. D.

Jan. 24, 1975.

---

Samuel S. Siegel, Chicago, Ill., for petitioner.

Asst. U. S. Atty. F. H. Branding for U. S. Atty. James R. Thompson, Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes before the Court on the motion of the Government to dismiss this petition for a writ of habeas corpus.

Petitioner Andrea Lieggi was born in Vola Debari, Italy on October 4, 1947. On April 25, 1963, when 16 years old, he came to the United States as a lawful immigrant to join his father, Guisseppi, a resident and citizen of the United States. In April, 1969, his mother, Isabelle and sister, Michelle, 11 years of age, joined his father in the United States. Upon his arrival in the United States, petitioner attended elementary and one year of high school in Chicago and became gainfully employed in this city until September, 1968, when he temporarily moved to and was employed in California.

On April 25, 1969, based on his own guilty plea, petitioner was convicted of violating Section 11531 of the California Health and Safety Code, for "wilfully, unlawfully and feloniously selling, furnishing or giving away a narcotic, to wit, marijuana." Petitioner's sentence was deemed to have been served by the 69 days he spent in the county jail before pleading guilty. In addition, a three year sentence of probation was imposed. Petitioner returned to Chicago to continue to live with his citizen parents and sister who were his only living relatives. From that time until the present, he has conducted himself in an exemplary lawful fashion, living with and supporting his family, maintaining steady employment, and never having any further trouble with the law.

There is nothing in the record before this Court which concretely establishes the exact details of the offense committed by petitioner. However, at the hearing counsel represented to the Court that the facts and circumstances were that Mr. Lieggi sold 3 marijuana cigarettes to his former roommate. Counsel repeatedly emphasized that although Mr. Lieggi was a personal user of marijuana he was never a seller or dealer.

Petitioner now alleges that the consent to the entry of the plea of guilty, the foregoing of a jury trial, and, the failure to protest the same were the result of petitioner's free will and judgment being over-reached by certain untrue representations told to petitioner by his trial attorneys. In substance as follows: "that a plea of guilty to either of said counts and a conviction thereof would in no mannner prejudice or jeopardize the Permanent Immigrant Status previously granted him by the U. S. Immigration Service." There is no doubt that if such a representation were made it was totally inaccurate.

Petitioner further contends that the California Courts erred in refusing to vacate his conviction of June 11, 1969. This contention is addressed particularly to said Appellate and Supreme Courts which summarily dismissed his appeals without giving him a "day in Court" and without ordering or even requiring the Respondent, the State of California, to deny the otherwise uncontroverted allegations of fact and law advanced by the petitioner.

On August 4, 1969, an order to show cause and notice of hearing was issued by the Immigration and Naturalization Service, charging that the petitioner was subject to deportation under the provisions of Section 241(a)(11) of the Immigration and Nationality Act, 8 U.S.C. Section 1251(a) in pertinent part provides:

"(a) Any alien in the United States . . . shall, upon the order of the Attorney General, be deported who—

\* \* \* \* \* \*

(11) is, or hereafter at any time after entry has been, a narcotic drug addict, or who at any time has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana, \* \* \*.

After two continuances, a deportation hearing was held pursuant to the August 4, 1969, order to show cause in Chicago on January 15, 1970. At the hearing, during which petitioner was represented by counsel, he admitted that as a result of a guilty plea he was convicted of "unlawfully and feloniously selling and furnishing and giving away a narcotic, to wit, marijuana." When questioned, petitioner declined to name a country to which his deportation should be directed if required by law. He was informed that if ordered deported, his deportation would be directed to Italy, the country of his citizenship. Petitioner was informed further of the provisions of Section 243(h) of the Immigration and Nationality Act, which would permit the withholding of his deportation to Italy if he felt that he would be persecuted by that country because of his race, religion or political opinions. He declined to make any application under that provision of the law. On March 4, 1970, the Special Inquiry Officer ren-

dered his decision ordering petitioner to be deported to his native Italy on the charge contained in the August 4, 1969, order to show cause.

Petitioner obtained the services of a new attorney and attempted to re-open his deportation proceedings. In response the Special Inquiry Officer stated: "Beyond the vague assertion that he might be deprived of the opportunity to provide for himself or might be denied all forms of employment, he has failed to present any evidence that would bring him within the provisions of 243(h) of the Immigration and Nationality Act."

Denial of petitioner's motion to re-open was appealed to the Board of Immigration Appeals, Washington, D. C. for the reasons that the decision was ". . . 1) rote, summary, peremptory, arbitrary, capricious, and contrary to the evidence and the law; and 2) . . . unfair to the extent it is tantamount to a denial of due process of law." The Board of Immigration Appeals, after consideration of the motion on its merits, affirmed the Special Inquiry Officer's denial of petitioner's motion to reopen.

On various occasions petitioner was granted a stay of deportation pending the outcome of his appeals in the California Courts. Finally on June 14, 1974 petitioner filed a petition for a writ of habeas corpus with this Court. The government responded with a motion to dismiss. A hearing on this matter was held by the Court. At the hearing no evidentiary materials were submitted. However counsel for both sides have provided this Court with an ample and adequate record of the previous proceedings in which petitioner has been involved. There are no real factual disputes. Yet, the appropriateness of granting the petition for a writ of habeas corpus in this case involves some very serious and substantial legal questions.

To summarize briefly, the petitioner has presented in his petition the following issues:

(1) Whether or not this Court has jurisdiction of this matter on a petition for a writ of habeas corpus;

(2) Whether or not his conviction in the California Court was proper due to incompetency of counsel in advising petitioner that his immigration status would not be affected by pleading guilty to the marijuana charges;

(3) Whether or not deportation under the Immigration and Nationality Act violates Constitutional rights allegedly guaranteed to petitioner;

(4) Whether or not deportation amounts to cruel and unusual punishment in violation of the Eighth Amendment.

## I. THIS COURT HAS PROPER JURISDICTION OVER THE DEFENDANT'S PETITION

█ Initially the government asked for a straight and narrow construction of the basic requirement that as a jurisdictional condition precedent to the qualification for habeas corpus the petitioner must be in actual custody under, or, by the authority of, the United States. This Court is of the opinion that the law only requires that the petitioner be under demand to surrender himself for deportation. Currently petitioner is under such a demand to surrender to the District Director of Immigration for immediate deportation to Italy.

In United States ex rel. Wirtz v. Sheehan, 319 F.Supp. 146 (E.D.Wis.1970) the Court held that:

"The term 'custody' within [subsection (c) of this section] requiring that petitioner be 'in custody' to be entitled to federal habeas corpus relief does not necessarily mean actual physical detention in jail or prison but rather is synonymous with restraint of liberty."

Adherence to a strict jurisdictional construction in a habeas corpus proceeding is not always mandated. As stated in Jung Woon Kay v. Carr, 88 F.2d 297 (9th Cir. 1937):

"The writ of habeas corpus is an extraordinary remedy which is not

bound by thongs of technical pleading, nor is its relief hindered by captious objection of fine spun theories of procedure."

■ Nevertheless this Court sought to insure proper jurisdiction of this matter by asking petitioner if he were willing to immediately surrender himself to the Director. The petitioner responded affirmatively. However, the Court had previously informed counsel for the government that should the actual physical surrender of the petitioner be required, the Court would order petitioner's immediate release during the pendency of this case. At that point in the hearing the government ceased to argue the jurisdictional issue. Although the government's formal objection to jurisdiction was properly presented, it was in reality nothing more than an argument based on a technicality. This Court is of the opinion that jurisdiction was proper and nothing further need be said on this issue.

■ On the other hand, this Court does not have proper jurisdiction over all the issues raised in the petition. Clearly this Court is without jurisdiction to hear a collateral attack upon the rulings imposed by a California Court. Any claims made by petitioner which allege incompetency of counsel or a lack of due process should have been made by way of direct appeal in the California proceedings. Consequently none of those claims will be considered here.

## II. THE EXACT CONSTITUTIONAL PROTECTIONS ACCORDED TO ALIENS HAS NOT BEEN CLEARLY ESTABLISHED

■ As early as 1886 our Supreme Court found that a resident alien is a person entitled to the protection of the equal protection clause of the Fourteenth Amendment in Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220. And generally it has been taken for granted that an alien resident in America is protected by the Bill of Rights. Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896); Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941); Comment, "The Alien and The Constitution" 20 U.Chi.L.Rev. 547, 565 (1953). However, the protections guaranteed by these fundamental rights have not as yet been extended to deportation proceedings.

Previously the underlying rationale for the denial of constitutional rights in deportation proceedings stemmed from the fact that Congress has a plenary power to deport as well as to exclude aliens. Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952). That a person legally residing in the United States could be deprived of such fundamental rights in a determination of whether he was to be expelled from the country is an extraordinary holding. Numerous Justices have vehemently dissented from such a position. Certainly the Constitution does not give the government a plenary power to deport or banish. Nevertheless the heretofore decided cases support the plenary theory.

Generally two basic arguments have been used to support Congress' plenary power and the narrow limits of due process in proceedings to deport. First is the fact that any sovereignty must act to protect its own self-interest. Second, there is the assumption that deportation is a civil action and thus the Bill of Rights has no real application. This approach received some very cogent criticism by one commentator who stated:

"The Court has used two basic arguments in upholding the narrow limits of due process in proceedings to deport. First, it has argued that the power to expel, as the power to exclude, is a plenary power deriving from the nature of sovereignty. Carried to its logical conclusion, this argument would support mass exile, without hearing or cause, of aliens

long resident in the United States. It would support political or religious persecution of resident aliens. For example, the government might expel Jewish or Catholic aliens under this logic; a Democratic administration might expel aliens it believed favored the Republicans, or vice versa. The theory of plenary power would support such action. . . .

The second basic argument of the Court has been that deportation is not a banishment. This argument in part derives from the sovereign power argument that an alien may be deported for any reason deemed expedient, then his expulsion is not a criminal punishment for some misdeed. Of course, if the power is truly sovereign, it seems unnecessary to argue whether the penalty is civil or criminal; the classification becomes merely a means of holding that procedural rights do not apply to deportation, without facing the general issue of whether a government may perform such 'sovereign' acts in ways repugnant to the Constitution." Notre Dame Lawyer Vol. 49 pp. 1094–1095 (1974). "Immigrants, Aliens, and the Constitution"

Although the absence of constitutional rights in deportation proceedings has been heavily criticized, previous decisions have been manifestly clear. As the Supreme Court previously stated in Fong Yue Ting v. United States, *supra*:

"The order of deportation is. not a punishment for crime. It is not a banishment, in the sense in which that word is often, applied to the expulsion of a citizen from his country by way of punishment. It is but a· method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty, or property, without due process of law; and the provi-sions of the constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures and cruel and unusual punishments, have no application." (149 U.S. 698 at 730, 13 S.Ct. 1016 at 1029, 37 L.Ed. 905)

The right of a nation to expel or deport foreigners who have not been naturalized has always been considered absolute and unqualified. The Appellate Courts have adhered to this principle. United States ex rel. Circella v. Sabli, 216 F.2d 33 (7th Cir. 1954), cert. denied 348 U.S. 964, 75 S.Ct. 525, 99 L.Ed. 752 (1955); De Lucia v. INS, 370 F.2d 305 (7th Cir. 1966), cert. denied 386 U.S. 912, 87 S.Ct. 861, 17 L.Ed.2d 784.

Specifically, in upholding the constitutionality of the statute authorizing deportation of an alien on the ground that the alien had committed the offense of the sale of a marijuana cigarette, the court in Van Dijk v. INS, 440 F.2d 798, at 799 (9th Cir. 1971) stated:

"The narcotics offense to which [petitioner] pleaded guilty was rather petty: sale of a marijuana cigaret. But Congress had a right to make the offense a ground to deport an alien."

Nevertheless the fact that persons involved in deportation proceedings do not enjoy constitutional rights has not been universally accepted. The Court's *Fong Yue Ting* premise that deportation is not punishment is fundamentally unbelievable. How can deportation of an alien legally residing in the United States be considered anything but punishment? In this case petitioner stands to lose his residence, livelihood, and most importantly, his family. Certainly if the same thing occurred to a United States citizen a Court would not hesitate to call it punishment—moreover, cruel and unusual punishment. As Justice Brandeis said in Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1921): "To deport . . . may result in loss of both property and life; or of all that makes life worth living."

More recently Justice Jackson in his dissenting opinion in Jordon v. De George argued that:

"A resident alien is entitled to due process of law. We have said that deportation is equivalent to banishment or exile. Deportation proceedings technically are not criminal; but practically they are for they extend the criminal process of sentencing to include on the same conviction an additional punishment of deportation. If respondent were a citizen, his aggregate sentences of three years and a day would have been served long since and his punishment ended. But because of his alienage, he is about to begin a life sentence of exile from what has become home, of separation from his established means of livelihood for himself and his family of American citizens. This is a savage penalty and we believe due process of law requires standards for imposing it as definite and certain as those for conviction of crime." 341 U.S. 223 at 243, 71 S.Ct. 703 at 714, 95 L. Ed. 886 (1951)

Certainly some of the most respected jurists in the history of this country have raised their pens often in dissent about the methods of deportation allowed under our laws. But of even more importance is the present attitude of the Supreme Court. At least three new cases dealing with aliens have been decided which seem to indicate that "the winds of change" are strongly blowing in the area of law dealing with rights of aliens legally residing in this country.

In the three recent cases, the Supreme Court has expanded the constitutional protections accorded to aliens. In Graham v. Richardson, 403 U.S. 365, 91 S. Ct. 1848, 29 L.Ed.2d 534 (1971), the Court struck down a state statute which limited welfare benefits to only U. S. citizens. Such a restriction was held to violate equal protection and the Court stated that classifications on the basis of alienage are "inherently suspect and are therefore subject to strict judicial scrutiny whether or not a fundamental right is impaired."

In Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Court applied this same argument in striking down a New York statute which limited employment in the competitive civil service only to citizens. The Court held that "a flat ban on the employment of aliens in positions that have little, if any, relation to a State's legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment."

In In re Griffiths, 413 U.S. 717, 93 S. Ct. 2851, 37 L.Ed.2d 910, the Court held to be violative of equal protection a state bar rule which prohibited the admission to the bar of aliens. "In order to justify the use of a suspect classification," said the Court, "a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary to the accomplishment' of its purpose or the safeguarding of its interest." Restriction of the bar to citizens was held not to be necessary to safeguard the interests of the people of the state or of the state itself.

Obviously, none of these cases could be cited as a controlling precedent to the problem that is currently before this Court. But if the Court held in Graham v. Richardson, *supra,* that alienage is a suspect criterion under the equal protection clause of the Fourteenth Amendment, then, the federal government must adhere to the same standard as do the states.

If equal protection is to have any real application for a resident alien, surely it has to mean that an alien cannot be deprived of his constitutional rights when involved in a deportation proceeding. Under the new decisions a state may not bar aliens from welfare benefits, from state employment, or from becoming members of the professions. Yet, if the plenary power of Congress theory is followed, the federal government can totally abridge all the constitutional protections and safeguards that a legal resident alien is supposed to enjoy.

██ This Court is of the opinion that application of the equal protection doctrine to legal resident aliens requires that they not be subjected to the penalty of deportation without the application, at a minimum, of those standards of due process and equal protection which would be enjoyed in a criminal trial involving a citizen. Indeed, since the Supreme Court has recognized that alienage is a suspect criterion, the application of the penalty of deportation, a penalty which applies only to aliens, should be upheld only upon the showing of a compelling state interest. That the law could hold the states to a different or higher standard than the federal government in protecting substantial rights is a dichotomy that the framers of the Constitution did not envision—nor would they likely approve.

At this time the Court is not aware of any decision which holds that an alien must be granted all the criminal standards of due process and equal protection in an adjudication on the issue of whether he is to lose his right of residence. Such standards would at least require right of counsel at all significant stages, some form of judicial approval of searches, a presumption of innocence, a right to bail, freedom from cruel and unusual punishment, etc.

The exact parameters of how far the Supreme Court will extend constitutional protections to aliens is still undetermined. In the interim this Court must deal with the problems of petitioner Lieggi. Thus the Court is faced with a dilemma. Should the Court follow the well established precedents which hold that an alien has no constitutional rights? Or should the Court take a step forward in following what it believes the Constitution and the future decisions of the Supreme Court will require, i. e., that aliens are entitled to some form of constitutional rights in deportation proceedings. In these moments of doubt, when the facts of this case make deportation such a heineous punishment, the Court has no real choice but to assume that the founding fathers —all immigrants and aliens in one sense —intended that the Constitutional protections be extended to all. Accordingly, this Court is of the opinion that petitioner Lieggi is entitled to at least minimal Constitutional rights.

III. THE FACTS IN THIS CASE PRESENT AN INSTANCE OF CRUEL AND UNUSUAL PUNISHMENT.

If the petitioner is entitled to Constitutional protection, this Court must next determine whether or not deportation in this case amounts to cruel and unusual punishment violative of the Eighth Amendment.

At the outset it must be noted that there is no precedent for applying cruel and unusual punishment standards to a deportation case. In fact, one court clearly rejected this argument. Chabolla Delgado v. I. N. S., 384 F.2d 360 (9th Cir. 1967). Historically, the Courts never considered the Eighth Amendment to be appropriate in deportation cases. Indeed this Court would be very reluctant to assess this question were it not for the peculiar factual situation in this case.

Petitioner Lieggi entered this country at the age of fifteen. After living in this country for over ten years he has only been involved with the law once. As counsel represented at the hearing the petitioner is currently the only financial support of the entire family. Furthermore, he has no close relatives living in Italy. He alleged, in his petition, that Italy is a strange and foreign country to him—both literally and figuratively. He has no independent means of financial support. Also present at the hearing were petitioner's family who testified that they are "inseparably bound up in this petition" and that the impending deportation "strikes at [their] hearts". Counsel, in oral argument before the Court, claimed that this deportation not only punishes petitioner, but also it destroys this American family. In support counsel cited passages from Alexander Solzhenitsyn's *Gulag*

*Archipelago,* but unfortunately no legal authority or precedent. Yet the facts of this case are rather unprecedented.

In regards to his one and only offense petitioner points out the mounting medical and legal concensus in the United States minimizing the dangers and criminal implications in the use of marijuana. In the past six years since petitioner's sole involvement with the law enforcement authorities, many of the states have substantially reduced the criminal penalties related to the use of marijuana.

In response to this situation Congress, in 1970, established the National Commission on Marijuana and Drug Abuse to study the extent of marijuana use and the efficacy of existing drug laws. After intensive study the Commission concluded that private possession of marijuana for personal use should no longer be a criminal offense (First Commission Report, note 1, at page 154).

Furthermore, the Commission found that:

" . . . Though a large amount of medical research had been conducted on the subject,

[n]o conclusive evidence exists of any physical damage, disturbance of bodily processes or proven human fatalities attributable solely to even high doses of marijuana. . . .

\* \* \* \* \* \*

[T]here is little proven danger of physical or psychological harm from the experimental or intermittent use of the natural preparations of cannabis. . . .

The Commission concluded that there is no reliable evidence that marijuana use produces genetic defects, injury to brain tissue or other organs, or significant physical, biochemical or mental abnormalities. These findings are consistent with a number of previous studies conducted by various governmental commissions, which concluded that 'the long-term consumption of cannabis in moderate doses has no harmful effects.'

The Commission contrasted these findings with the known effects of alcohol use, which can result in death.

\* \* \* \* \* \*

The National Commission on Marijuana and Drug Abuse also rejected the assumption that marijuana use is addictive."

Punishment for marijuana possession has been greatly reduced. As one study shows:

" . . . a number of states have eliminated (or nearly eliminated) imprisonment as a punishment for marijuana possession. Possession of up to one ounce of marijuana is punishable by a maximum fine of $100 in Oregon; incarceration has been eliminated as a sanction. In Massachusetts, probation is mandatory upon first conviction for possession. West Virginia law provides that any first possession or distribution offense (less than fifteen grams) must be conditionally discharged. Likewise, a conviction as a 'disorderly person,' a quasi-criminal non-indictable offense, is the maximum which can be imposed for possession of twenty-five grams or less in New Jersey. Nebraska imposes a maximum penalty of seven days' imprisonment for conviction of possession of up to one pound of marijuana. Other states provide for minimal imprisonment. In addition, at least thirty-two states now have statutes resembling the conditional discharge provisions of the Uniform Controlled Substances Act. These statutes provide for dismissal without an adjudication of guilt upon completion by the arrestee of conditions set by the court. Although California has purportedly enacted the Uniform Controlled Substances Act, the substantially less severe penalties for marijuana possession recommended in the Uniform Act were excluded in the California Act," U.C.L.A.Law Review, Vol. 21 at 1161 (1974) (footnotes omitted).

In considering the scope of the cruel and unusual proscription the

Supreme Court has considered few cases. Still, several themes or basic principles are clear. At the heart of the amendment is the equality and dignity of all men guaranteed by the Constitution. Yet the ban on cruel and unusual punishment knows no rigid standard. In Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), the Court found that the concept of cruel and unusual punishment:

". . . is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a human justice."

The Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society. Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Punishments which are excessive in length or severity or which are in great disproportion to the offenses charged may not be imposed. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Needless to say this Court is aware of the Government's argument that no cruel and unusual punishment stems from the actual sentence imposed by the California court. But the overall effect, the reality of the situation, is that petitioner Lieggi and his family will suffer severe punishment in relation to the offense unless this Court grants him some form of relief. The Court is reminded of the words of Madison: "If banishment of this sort be not punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied."

The imposition of any sentence following a conviction under Section 11351 of the California Health and Safety Code [cultivation, possession, transportation, sale of marijuana] is now under serious question. (See People v. Anderson, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880, cert. denied, 406 U.S. 958, 93 S.Ct. 2060, 32 L.Ed.2d 344 (1972); In re Lynch, 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1972); U.C.L.A.Law Review, Vol. 21:–136 (1974), "Marijuana Possession and the California Constitutional Prohibition of Cruel or Unusual Punishment." Justice Mosk of the California Supreme Court has observed that "there are straws in the wind to suggest the next section upon which legal fashions focus will be the Eighth Amendment" (see Mosk, "The Eighth Amendment Rediscovered," 1 Loyola (L.A.) L. Rev. 4 at 4 (1968).

Finally, lest there be doubts about this opinion, it must be stated that the government is legally correct in attempting to deport petitioner Lieggi. However, this Court, in its sole and studied discretion must occasionally look beyond legal principles and precedents to prevent an intolerably inequitable and unjust result. The unique facts of this case require this Court to exercise its equitable powers in granting a writ of habeas corpus. Very frequently this Court is presented with petitions for a writ of habeas corpus. On only a very few occasions has this Court granted such a petition. But the compelling circumstances of this case, the recent developments in this once dormant area of the law, the change in legal and social attitudes toward violators of the marijuana laws, all of these factors make deportation of petitioner Lieggi a rather acrimonious act under our contemporary standards of decency and equality.

Accordingly, defendant's motion to dismiss is denied. The petition for a writ of habeas corpus is granted.