Charlie F. WADE et al., Plaintiffs,

and

United States, Plaintiff-Intervenor,

v.

MISSISSIPPI COOPERATIVE EXTENSION SERVICE et al., Defendants.

No. EC 70–29–K.

United States District Court, N. D. Mississippi, E. D.

Dec. 14, 1976.

Frank R. Parker, III, Jackson, Miss., for plaintiffs.

Mary Planty, Dept. of Justice, Washington, D.C., for plaintiff-intervenor.

William A. Allain, Jackson, Miss., Pat M. Barrett, Lexington, Miss., Fred B. Smith, Ripley, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is a class action by black citizens of Mississippi pursuant to 42 U.S.C. §§ 1981–83 and 2000d et seq. to end racial segregation and employment discrimination in the operation of the Mississippi Cooperative Extension Service (MCES), a federally-assisted state agency. The United States, through the Department of Justice, has participated as a plaintiff-intervenor under 42 U.S.C. § 2000h–2. The Secretary of Agriculture (Secretary) and the Administrator of the Extension Service (Administrator) of the United States Department of Agriculture (USDA), originally named as parties de-fendant, were realigned as plaintiffs upon intervention by the Attorney General. On February 15, 1974, we issued our opinion and judgment on the merits, finding impermissible racial discrimination in the operation of MCES and granting extensive injunctive and declaratory relief to the plaintiffs. *Wade v. Miss. Cooperative Extension Service*, 372 F.Supp. 126 (N.D.Miss.1974). The defendants, who include MCES and its director, Mississippi State University (MSU) and its president, the Board of Trustees of the Institutions of Higher Learning (the Board) and its president and executive secretary, and the members of the Board of Supervisors of Holmes County, Mississippi, prosecuted an appeal from this judgment. On June 17, 1974, while the appeal on the merits was pending before the Fifth Circuit, we issued a supplemental opinion and order granting counsel for plaintiffs an attorneys' fee award for $11,500. *Wade v. Miss. Cooperative Extension Service*, 378 F.Supp. 1251 (N.D.Miss.1974). An appeal was taken from this order as well and consolidated with the appeal on the merits.

On February 24, 1976, the Court of Appeals substantially affirmed on the merits but vacated and remanded for further consideration in light of supervening decisions that portion of our judgment awarding attorneys' fees and back pay to the individual defendants, Charlie F. Wade and LaVerne Y. Lindsey. *Wade v. Miss. Cooperative Extension Service*, 528 F.2d 508 (5 Cir. 1976).

The issues before us on remand, as summarized by the Court of Appeals, are as follows:

(1) Is there a permissible basis, under *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), for an attorney fee award in this case?

(2) Are the various state and county corporate defendants in this action "persons" within the meaning of 42 U.S.C. § 1983, and therefore suable under that statute?

(3) Are the various state and county corporate defendants suable under the provisions of 42 U.S.C. § 1981?

(4) Does the Eleventh Amendment, as construed in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), bar this court from making back pay and attorney fee awards against the state and county defendants?

(5) Do any or all of the individual defendants benefit by *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which granted a qualified immunity to public officials acting in good faith?

(6) Were the Secretary and the Administrator properly realigned as plaintiffs following the intervention of the Department of Justice?

## I. The Attorney Fee Issue

Any discussion of the power of federal courts to grant attorney fee awards to successful litigants must begin with *Alyeska Pipeline Service Co., supra*, where the Supreme Court eliminated the "private attorney general" exception to the American rule of not permitting prevailing parties to recover attorney fee awards. Since our original, pre-*Alyeska* award in this case was premised on the private attorney general rule, we must now consider whether an award may be made under some alternative rationale. Alyeska specifically permits the federal courts to make attorney fee awards in a number of delineated situations, three of which may arguably apply here:

(1) Where the plaintiff has recovered or preserved a fund for the common benefit of himself and others and may assess an attorney fee award from that fund;

(2) Where the defendant has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons;"

(3) Where the attorney fee award is specifically authorized by an appropriate statute.

■ (a) The Common Benefit Theory—Plaintiffs' first argument for an attorney fee award here is based on the "common benefit" theory, that their successful litigation has conferred "a substantial benefit on the members of an ascertainable class and [that here] the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the cost proportionately among them," *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393–94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970); accord, *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The common benefit theory, however, has no application to this case, and cannot serve as the basis for any award.

*Mills* was a stockholder derivative action against a corporate defendant, with the shareholders benefitting as a group by the successful setting aside of a corporate merger based on misleading proxy statements. By assessment of attorneys' fees against the corporation, the court was able to spread the cost of the litigation equitably among the shareholders, who were the direct beneficiaries of the suit. *Hall* involved an action by a union member against his union, which had violated his free speech rights guaranteed by § 101(a)(2) of the Labor Management Reporting and Discrimination Act. There, the court held that the successful prosecution of the suit rendered a substantial benefit both to the plaintiff and to all members of his union. The award, which was made against the union, likewise served to allocate the cost of the litigation among all the union's members, who benefitted similarly from this vindication of their First Amendment rights. See also, *National Resources Defense Council, Inc. v. Environmental Protection Agency*, 484 F.2d 1331 (1 Cir. 1973).

The present case contains no possibility of cost allocation and in that respect is legally indistinguishable from *Hander v. Jan Jacinto Junior College*, 519 F.2d 273 (5 Cir. 1975), where the plaintiff, a teacher in a state junior college, sued successfully to invalidate a regulation prohibiting long hair and beards for faculty members. The Fifth Circuit rejected Hander's "common benefit" argument for an attorney fee award in language applicable here:

In the instant case, the costs [of litigation] were not spread among those who would profit from the litigation—other teachers and employees—and the party against whom the district court assessed

the attorneys' fees—the college—hardly derived any benefit from the invalidation of the grooming regulation. 519 F.2d at 281

In the instant case, even assuming that this action has conferred a substantial benefit upon an ascertainable class, assessment of an attorney fee award against the state and county defendants will hardly spread the cost of the litigation among the plaintiff class members who arguably might have benefitted from the prosecution of this action.

■■■ (b) Bad Faith—Plaintiffs' next asserted basis for a fee award is founded on the court's traditional power to grant such an award where a defendant has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *F. D. Rich Co. v. United States*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703, 714 (1974). They contend that an award is justified because the MCES employment practices which were the primary subject of dispute in this action were carried out in bad faith and to oppress black employees, and because the defenses interposed were maintained in an obdurately obstinate manner in light of settled principles of law.

Bad faith in practicing discrimination in employment goes to liability of the defendants and the availability of the qualified immunity from individual liability afforded public officers for their actions taken in good faith, discussed *infra*. This is a different question from whether the case was litigated without any reasonable basis for contest. Considering the totality of defendants' actions and the state of the applicable law at the time of suit, we conclude that the defense of this action was not maintained in such bad faith as to warrant an award of attorney fees under the court's discretionary power.

Admittedly, the across-the-board demotion in job classification of MCES black professional employees subsequent to the 1965 merger of the dual segregated system was patently discriminatory. Nevertheless, MCES on its own initiative dismantled the dual structure, and took concrete steps toward elimination of inequality in the pay of white and black professional employees. Also, before suit was filed, MCES Director Bost instituted the practice of notifying all qualified employees of any staff job vacancies, uniform salaries for entry-level employees were established, and the agency provided all services other than local 4–H activities on a nondiscriminatory basis. We found that the discriminatory aspects of the local 4–H Clubs were not the result of any discriminatory intent of MCES.

The crux of plaintiffs' case was racial discrimination in promotional opportunities and salary increases within the agency. Although no black had been promoted to the position of county agent or extension home economist between merger and institution of suit, defendants vigorously maintained that this fact was not attributable to racial animus, but instead was the result of superior qualifications of promoted whites as determined by the agency's purportedly nondiscriminatory standards for promotion. The disparity between the races as to pay raises was explained on the same basis. Some of the criteria used in determining salary increases and promotability, viz., "job performance" as measured by scores on an evaluation form developed by the MCES and the USDA and scored by MCES supervisory personnel, and "concept of job applied for," also as determined by agency supervisory employees, were found to be impermissibly vague and subject to discriminatory application. Other factors, however, utilized in assessing personnel for promotion, i. e., length of service, academic degree held, and technical knowledge, were found to be objective and racially nondiscriminatory.

In voiding the agency's job performance evaluation form, we applied Title VII testing validation standards and determined the defendants had not satisfied their burden of proving that the form, shown to have had a disparate racial impact, was in fact nondiscriminatory. The Court of Appeals, however, disapproved our use of Title VII validation standards in this § 1981 action, but nevertheless found the evaluation

form deficient in that it failed to meet the job-relatedness constitutional standard of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In light of the unsettled nature of the law relating to testing in the employment discrimination context, evidenced by our own erroneous application of Title VII validation standards, we do not think defendants' posture may be characterized as a bad faith defense for purpose of an attorney fee award. See generally *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

A further ground for our refusal to award attorney fees under the bad faith exception is the fact that plaintiffs failed to prevail on all of the issues raised in their complaint. For example, one of the three named plaintiffs, Athaniel H. Moody, who claimed to have been a victim of racial discrimination in promotion, was found not to be entitled to any relief, as the white appointed to the position of county agent in his stead possessed superior objective qualifications. Plaintiffs were also unsuccessful in their attempt to compel MCES to reopen 4–H summer camps, the court finding no racial motivation in the closing of the camps, and no racially discriminatory result. Likewise, we found no racially discriminatory intent in the withdrawal of the 4–H program from the public schools, and nothing impermissible per se in the withdrawal. Although we previously held that plaintiffs' failure to prevail on every point litigated did not prevent plaintiffs from being deemed the prevailing party, the successful defense in these areas of the controversy negates a finding that this action was resisted in bad faith. In fact, the case involved complicated and difficult legal issues, and the defenses interposed to the claims asserted may not be properly characterized as vexatious or oppressive.

(c) Statutory Authorization—Plaintiffs' final theory in support of an allowance of attorney fees is that the court is specifically authorized by statute to award attorney fees in a case of this type. The first purported statutory basis is Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiffs contend that although Title VII did not apply to employment discrimination practiced by government agencies at the time this action was filed—April 29, 1970—the 1972 amendments to Title VII, which extended the strictures of the act to state employment practices, also authorized court-awarded attorney fees to a successful plaintiff in Title VII litigation against a state agency. Though plaintiffs did not bring this suit under Title VII, as indeed they could not have done at the time of commencement of the action, they assert that amendment of their pleadings to invoke Title VII is proper under 28 U.S.C. § 1653, since two members of the plaintiff class have now filed EEOC charges of discrimination and have received right-to-sue letters from the agency.[1] These charges were filed in December 1975, almost 5 years after suit was commenced, and nearly 2 years after affirmative relief was granted to the plaintiff class.

An award of attorney fees cannot be here founded on Title VII. The general rule as to whether a change in the applicable law is to be applied in a given case begun prior to such a change is "that a court is to apply the law in effect at the time it renders its decision unless doing so

---

1. The Department of Justice contends that amendment of its complaint in intervention to assert a Title VII section 707, 42 U.S.C. § 2000e–6, pattern-and-practice suit would provide a legal basis for an award of attorney fees to private plaintiffs. No motion has been filed to amend the complaint in intervention to state such a claim, but in any case, we believe this contention is without merit. It is a *prerequisite* to the Attorney General filing a section 707 action that he have reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of discrimination, *Unit-*

*ed States v. Masonry Contractors Association of Memphis, Inc.*, 497 F.2d 871 (6th Cir. 1974). Section 707 further contemplates an original action by the Attorney General, with private parties adversely affected by the alleged discrimination limited to the status of permissive intervenors. *See United States v. Alleghany-Ludlum Industries, Inc.*, 517 F.2d 826 (5th Cir. 1975). Here, of course, the private plaintiffs filed the original action, and the Department of Justice intervened pursuant to statutory right under 42 U.S.C. § 2000h–2.

would result in a manifest injustice or there is a statutory direction or legislative history to the contrary, "*Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488 (1974). We think a "statutory direction" precludes plaintiffs' reliance on Title VII as a basis for their alleged entitlement to attorney fees. Title VII provides an administrative scheme by which state employees who feel they have been discriminated against in a manner violative of the Act must file an administrative charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) prior to commencing a civil action against an employer based upon alleged violation of the Act. 42 U.S.C. §§ 2000e–5(b) and (e). The purpose of this requirement is to provide EEOC an opportunity to investigate and conciliate a nonjudicial settlement of an employment practices grievance before suit can be brought thereon. After the EEOC is afforded an investigation and conciliation opportunity, the EEOC, if unable to conciliate the grievance, issues a notice to the charging party of the right to file a civil action on the basis of his Title VII charge; the charging party then may file his civil complaint, 42 U.S.C. §§ 2000e–5(b) and (f). The Supreme Court has held that both the filing of a timely charge of discrimination with the EEOC and the timely institution of a civil action after receipt by the charging party of the EEOC notice of his right to file suit are *jurisdictional prerequisites* to maintenance of a Title VII civil action, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668, 675 (1973). Since the case sub judice was filed almost two years prior to the effective date of Title VII as applied to employment discrimination practiced by government agencies, plaintiffs could not satisfy the jurisdiction conditions precedent to a Title VII civil suit as set forth in *McDonnell Douglas Corp., supra.*

Plaintiffs' attempted analogy of this case to those holding retroactive certain of the 1972 amendments to Title VII does not withstand analysis. Most of the cases cited by plaintiffs, *e. g., Koger v. Ball*, 497 F.2d 702 (4 Cir. 1974), involve federal government employee charges of pre-amendment employment discrimination which were pending in federal administrative proceedings on the effective date of the 1972 amendments. What these cases hold is that § 717 of Title VII, 42 U.S.C. § 2000e–16, extending coverage of Title VII to federal employees, applies to such charges since the administrative remedies required by § 717(c) to be exhausted as a precondition to a civil action are identical to the administrative remedies which a federal employee was required to exhaust to obtain relief on a pre-Title VII federal employment discrimination claim.[2]

Section 717(c) evinces a congressional policy to make the courts the final tribunal for the resolution of controversies over charges of discrimination *after all administrative remedies have been exhausted.* This policy applies with equal reason to discrimination that occurred either before or after the passage of the Act when the earlier discrimination was the subject of administrative proceedings at the time of enactment. *In both instances, the wrong is similar, and the requirement for exhaustion of adminis-*

---

**2.** 42 U.S.C. § 2000e–16(c) provides:

(c) Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Civil Service Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive Orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency,

or unit or with the Civil Service Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

*trative remedies is the same. Koger v. Ball,* 497 F.2d at 706. (Emphasis added) The *Koger* court further explained that: Clearly, Congress gave its consent for suits to redress discrimination occurring after passage of the Act. Whether this consent extends to pending cases of pre-Act discrimination depends on the propriety of retrospective application of the Act. . . .

> The only condition precedent to suit that Congress created was the exhaustion of administrative remedies including those remedies that Executive Order 11478 made available both before and after the passage of the Act. Since Koger's pending case satisfied this condition precedent, the express language of § 717(c) authorizes him to seek judicial relief. In this respect, he stands in the same position as an employee who exhausted his administrative remedies for a claim of post-Act discrimination. *Id.* at 708

Applying the same reasoning, the Court of Appeals for the District of Columbia held § 2000e–16 applicable to federal employee claims of pre-amendment discrimination which were pending in judicial proceedings, subsequent to exhaustion of federal administrative remedies, on the effective date of the 1972 amendments. *Womack v. Lynn,* 164 U.S.App.D.C. 198, 504 F.2d 267, 269 n. 6 (1974).

The rationale of the above cases clearly has no application to the case sub judice. Prior to the 1972 amendments to Title VII, no administrative remedies equivalent to the statutory EEOC procedures were available to MCES employees. Obviously, if no such administrative remedies were extant, there could have been no satisfaction of the § 2000e–5 exhaustion requirement which must be fulfilled as a condition precedent to commencement by state employees of a civil action based on Title VII.

Plaintiffs also cited *Hankerson v. Ohio Bureau of Employment Services,* 8 EPD # 9804 (N.D.Ohio 1974), in support of their argument that amendment of their complaint to assert a Title VII claim is proper.

In *Hankerson,* a female employee of the state agency defendant on March 30, 1972, filed an EEOC charge of sex discrimination alleging that in January 1972 she had been denied a promotion on the basis of her sex. After receipt of her EEOC right-to-sue notice, Hankerson filed a civil action against the agency; the agency then moved to dismiss the suit on the ground, inter alia, that the alleged discrimination complained of took place prior to coverage of the agency by Title VII. The court rejected the agency's contention, holding that "the 1972 amendment to Title VII covers charges of pre-amendment discrimination in state employment on such charges filed *after* March 24, 1972." 8 EPD at 6366. This statement, however, must be read in light of the particular facts of *Hankerson, viz.,* the EEOC charge was, under the 1972 amendments to § 2000e–5(f), timely filed, and furthermore, the civil action was not commenced until EEOC administrative remedies had been fully exhausted. Thus, *Hankerson,* in this court's opinion, holds that the 1972 amendments to Title VII extending coverage to state employees apply retroactively in a civil action based on pre-amendment acts of discrimination only where a charge of discrimination has been timely filed with the EEOC and only where statutorily required EEOC administrative proceedings have been exhausted prior to commencement of the civil action. Assuming, then, that the filing in late 1975 by two members of the class of EEOC charges was timely, such filing and exhaustion of EEOC administrative remedies nevertheless cannot be utilized as a vehicle to convert this action filed some 5 years earlier into a Title VII cause, for the reason that exhaustion of EEOC remedies must be completed prior to the commencement of an action seeking relief under the act. Nor can plaintiffs' failure to exhaust EEOC remedies prior to filing this action, albeit because such remedies were unavailable at the time, be cured, as plaintiffs contend, by the relation-back provision of Rule 15(c), F.R.Civ.P. The allegation of the substantive violation of the act might relate back, but there is no way exhaustion of EEOC remedies can be related back prior

to commencement of the action. For the foregoing reasons, amendment of the complaint to invoke Title VII as a jurisdictional basis for this action is improper, and plaintiffs' motion to amend accordingly must be denied.

■ Plaintiffs argue that § 718 of the Emergency School Aid Act, 20 U.S.C. § 1617, provides alternative statutory authorization for the recovery of attorney fees. This argument is predicated on the general statements in our original opinion that MCES is a state agency whose programs "are essentially educational in nature," *Wade v. Miss. Cooperative Extension Service*, 372 F.Supp. 126, 131 (N.D.Miss. 1974), and that the nonracially motivated discontinuance of the MCES-sponsored 4–H Club program in the state schools, and contemporaneous reorganization of the clubs on a community basis, "resulted in the formation of many racially segregated clubs," 372 F.Supp. at 138. These two statements, however, are hardly adequate to transform what is essentially an employment discrimination suit into a suit to end "discrimination on the basis of race . . in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States *as they pertain to elementary and secondary education* . . .," 20 U.S.C. § 1617 (emphasis added). The present action does not implicate racial discrimination which can realistically be said to be related to elementary and secondary education. Since this alternative statutory authorization for attorney fees is found to be inapplicable to

the instant case, plaintiffs' reliance upon it is unavailing.

■ Plaintiffs' third asserted statutory authorization for an award of attorney fees is the recently-enacted Civil Rights Attorney's Fees Awards Act of 1976, S.2278, P.L. 94–559, signed into law on October 19, 1976, 90 Stat. 2641.[3] The legislative history of the Act expressly states that it was enacted to provide the "specific authorization required by the Court in *Alyeska*" necessary to sustain a court award of attorney fees to a prevailing litigant, S.Rep.No.94–1011, 94th Cong., 2d Sess., p. 4, U.S.Code Cong. & Admin.News 1976, pp. 6338, 6342. Furthermore, the Senate Report clearly indicates that the Fee Award Act is intended to harmonize the incongruity of allowing attorney fees in Title VII employment discrimination cases but disallowing fees in such cases brought under § 1981.[4]

There is no discernible statutory direction or legislative history dictating against retroactive application of this Attorneys' Fee Award Act in a pending case. On the contrary, affirmative evidence is that Congress intended this new law to be applied in all pending cases to which it is applicable. In the House Report on the companion bill in the House, H.R.15460, the Committee on the Judiciary said:

In accordance with applicable decisions of the Supreme Court, the bill is intended to apply to all cases pending on the date of enactment as well as all future cases. *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). H.Rep.No.94–1558, 94th Cong., 2d Sess., p. 4, n. 6.

---

**3.** "Sec. 2. That the Revised Statutes section 722 (42 U.S.C. 1988) is amended by adding the following: 'In any action or proceeding to enforce a provision of sections 1977, 1978, 1979, 1980 and 1981 of the Revised Statutes [42 U.S.C. §§ 1981, 1982, 1983, 1985, and 1986], title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.' "

**4.** "This decision [*Alyeska*] and dictum created anomalous gaps in our civil rights laws whereby awards of fees are, according to *Alyeska*, suddenly unavailable in the most fundamental civil rights cases. For instance, fees are now authorized in an employment discrimination suit under Title VII of the 1964 Civil Rights Act, but not in the same suit brought under 42 U.S.C. § 1981, which protects similar rights but involve fewer technical prerequisites to the filing of an action." S.Rep.No.94–1011, 94th Cong., 2d Sess., p. 4, U.S.Code Cong. & Admin. News 1976, p. 6341.

Similarly, in the floor debate in the Senate on S.2278, and moments prior to the final vote on the bill, Senator Abourezk—the floor manager of the bill—said:

"The Civil Rights Attorneys' Fees Award Act authorizes Federal courts to award attorneys' fees to a prevailing party in suits presently pending in the Federal courts. The application of this Act to pending cases is in conformity with the unanimous decision of the Supreme Court in *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

"This application is necessary to fill the gap created by the Alyeska decision and thus avoid the inequitable situation of an award of attorneys' fees turning on the date the litigation was commenced." 122 Cong.Rec. S 17052 (September 29, 1976, daily ed.) (remarks of Sen. Abourezk).

We are compelled to conclude that the Civil Rights Attorney's Fees Awards Act of 1976 clearly is applicable to this pending employment discrimination action. We find no special circumstances or other conditions in this case which would render an award of attorney fees unjust or even inappropriate here.[5] Though plaintiffs' other grounds for claiming attorney fees are legally insupportable, we hold that their claim is nevertheless meritorious by reason of the recent legislation. Plaintiffs are thus entitled to an award of reasonable attorney fees against the defendants, provided that the defenses of Eleventh Amendment and qualified good-faith official immunity do not insulate certain defendants from liability on such an award.

## II. Back Pay

A. Section 1983 Jurisdiction of State and County Corporate Defendants.

 The state corporate defendants in this action are the MCES, MSU and the Board; other defendants are individuals sued in their respective official capacities as Director of MCES, President of MSU, President of the Board, Executive Secretary of the Board, and members of the Holmes County Board of Supervisors. Recent decisions of the Fifth Circuit leave no doubt that an action nominally filed against individual members of a government agency in their official capacities cannot be maintained under § 1983 where the action seeks to utilize the officials as a conduit to the treasury of an agency itself not a "person" for purposes of 1983 jurisdiction. *Thurston v. Dekle,* 531 F.2d 1264 (5 Cir. 1976); *Muzquiz v. City of San Antonio,* 528 F.2d 499 (5 Cir. 1976). It is well settled that the various arms of state government are not "persons" within the ambit of § 1983. *E. g., Vick v. Texas Employment Commission,* 514 F.2d 734 (5 Cir. 1975); *Cheramie v. Tucker,* 493 F.2d 586 (5 Cir.), cert. denied 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974) (department of highways); *Bennett v. People of California,* 406 F.2d 36 (9 Cir. 1969) (department of corrections). The same is true as to state universities. *Gay Students Organization v. Bonner,* 509 F.2d 652 (1 Cir. 1974); *Blanton v. State University of New York,* 489 F.2d 377 (2 Cir. 1973); *Sellers v. Regents of University of California,* 432 F.2d 493 (9 Cir. 1970), cert. denied 401 U.S. 981, 91 S.Ct 1194, 28 L.Ed.2d 333 (1971); and as to counties, *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); and units of county government such as a board of supervisors, *Cole v. Tuttle,* 366 F.Supp. 1252 (N.D.Miss. 1973); *Veres v. County of Monroe,* 364 F.Supp. 1327 (E.D.Mich.1973); *Kish v. County of Milwaukee,* 48 F.R.D. 102 (E.D. Wis.1969). It is thus beyond dispute that no § 1983 jurisdiction exists to award back pay against the various corporate defendants and officers sued in their official capacities.

---

5. "It is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act. A party seeking to enforce the rights protected by the statutes covered by S.2278, if successful, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)." S.Rep.94–1011 at 4, U.S.Code Cong. & Admin.News 1976, p. 6342.

**B. Section 1981 Jurisdiction of State and County Corporate Defendants.**

■ As suggested by the Court of Appeals in their remand, the question of whether a government entity is subject to a suit seeking an award of back pay under § 1981 is a separate inquiry apart from the entity's liability to such suit under § 1983. There is disagreement between the circuit courts, and between the district courts, on the threshold question as to whether the "person" requirement of 1983 is applicable to 1981. *Compare Arunga v. Weldon,* 469 F.2d 675 (9 Cir. 1972), *and Black Brothers Combined v. City of Richmond,* 386 F.Supp. 147 (E.D.Va.1974) (indicating "persons" requirement is equally applicable) *with Baker v. F & F Investment Co.,* 489 F.2d 829 (7 Cir. 1973), *and Hines v. D'Artois,* 383 F.Supp. 184 (W.D.La.1974) (reaching the opposite conclusion). In a recent decision, *Campbell v. Gadsden County District School Board,* 534 F.2d 650 (5 Cir. 1976), the Fifth Circuit has established its position on this issue by holding that the limitation of liability under § 1983 to "persons" is not applicable to § 1981, and that there is federal jurisdiction of a § 1981 complaint seeking back pay and other equitable relief against a county school board and the members of that board sued in their official capacities. *See Kelly v. West Baton Rouge Parish School,* 517 F.2d 194 (5 Cir. 1975).

In reaching the above result in the *Campbell* case, the Court relied upon the interpretation of 42 U.S.C. § 1982 set out in *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), since both sections 1981 and 1982 derive from the Civil Rights Act of 1866 and are therefore to be construed in the same manner, *Tillman v. Wheaton-Haven Recreation Ass'n., Inc.,* 410 U.S. 431, 439–40 & n. 11, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973), "at least in contexts where an exemption from the non-discrimination requirements of the statutes is being asserted," *Campbell, supra,* 534 F.2d at 654, n. 9. The Supreme Court, in *District of Columbia v. Carter, supra,* held that

§ 1982 is not a "mere prohibition of state laws establishing or upholding" racial discrimination in the sale or rental of property but, rather, an "absolute" bar to *all* such discrimination, private as well as public, federal as well as state. 409 U.S. at 422, 93 S.Ct. at 605, 34 L.Ed.2d at 612.

Applying this language to the "nondiscrimination requirements" of § 1981, and following the logic of the *Campbell* case, the corporate defendants here, as well as the individual defendants sued in their official capacities, appear to be subject to back pay liability under § 1981, unless the Eleventh Amendment precludes such relief.

**III. Effect of the Eleventh Amendment**

**A. State Defendants**

We are guided in our determination of this issue by *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614, where the Supreme Court explained the scope of the protection from suit afforded the states by the Eleventh Amendment. That case involved a claim against a state employer brought under Title VII seeking retroactive retirement benefits due male employees because of the employer's past discrimination on the basis of sex in providing such benefits.

Through the 1972 amendments to Title VII, Congress expressly extended the coverage of Title VII to state government employees, and authorized an award of money damages in favor of such an employee prevailing in a Title VII suit against his state employer. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), held that the Eleventh Amendment barred recovery of damages payable from a state treasury in an action based on a state's noncompliance with HEW regulations relating to administration of the state's Aid to the Aged, Blind and Disabled program. The state defendants in *Bitzer* maintained that the Eleventh Amendment as interpreted in *Edelman* precluded congressional authorization of any suit by individuals seeking monetary damages payable out of a state treasury. Rejecting that contention, the Supreme Court held that the reach of

the Eleventh Amendment was limited by the enforcement provisions of § 5 of the Fourteenth Amendment, and that legislation enacted pursuant to § 5 providing for private actions against states or state officials pro tanto abrogated the states' Eleventh Amendment immunity.[6] According to *Bitzer*, the key to determining whether Eleventh Amendment immunity is destroyed arises from the "threshold fact of congressional authorization" to subject a state to damages actions by individuals, 427 U.S. at 452, 96 S.Ct. at 2670, 49 L.Ed.2d at 619. Congressional intent in passage of a statute such as Title VII is, of course, evident. The more difficult question, however, not answered in *Bitzer*, and presented here, is whether the requisite congressional intent may be present in a statute not expressly authorizing suit against a state for money damages.

 We believe that the required congressional authorization may be supplied by clear and unequivocal legislative history of a statute although its terms do not expressly provide for private actions against states or state officials. Here, it is manifest that the Civil Rights Attorney's Fees Award Act of 1976 is accompanied by a legislative history of such character. Indeed, it is difficult to envision a more ex-

plicit statement of the requisite legislative intent than that contained in the Senate Report on the Attorney's Fees Act:[7]

In several hearings held over a period of years, the Committee has found that fee awards are essential if the Federal statutes to which S.2278 applies are to be fully enforced. We find that the effects of such fee awards are ancillary and incident to securing compliance with these laws, and that fee awards are an integral part of the remedies necessary to obtain such compliance. Fee awards are therefore provided in cases covered by S.2278 in accordance with Congress' powers under, inter alia, the Fourteenth Amendment, Section 5. As with cases brought under 20 U.S.C. § 1617, the Emergency School Aid Act of 1972, defendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party). S.Rep.No.94–1011 at 5, U.S.Code Cong. & Admin.News 1976, p. 6343.

The Eleventh Amendment, then, is no bar to an award here of attorney fees against

---

6. The *Bitzer* holding is equally applicable to awards of damages against defendant state agencies or officers and awards of attorney fees against such defendants. 427 U.S. at 455–457, 96 S.Ct. at 2671–2672, 49 L.Ed.2d at 622.

7. Similarly, the House debate on House approval of the bill as amended in the Senate indicates an intention that the new Act was to apply to public employment discrimination cases:

"MR. FISH. Mr. Speaker, the civil rights attorney's fee bill, S.2278, would allow a court, at its discretion, to award attorney's fees to a prevailing party in suits brought to enforce the civil rights laws. The purpose of the bill is to allow the courts to provide the traditional remedy of counsel fee awards to private citizens who must go to court to vindicate their rights under the civil rights statutes.

The Supreme Court's recent Alyeska decision requires specific statutory authority for attorney's fee awards. This bill restores to the courts authority which they had exer-

cised for years under the private attorneys general concept. It fills the gap in the civil rights laws under which attorney's fees have become unavailable in the most fundamental civil rights cases.

The average citizen does not have the financial resources to bring suit to enforce his rights unless attorney's fees are awarded. This bill should be passed in order to provide more effective enforcement of the civil rights laws.

Without the provision of attorney's fees, it would be very difficult to bring cases such as the following:
* * *

Third, Suits under section 1979 of the Revised Statutes, by blacks denied employment by the State highway safety patrol on the basis of race, *Morrow v. Crisler* (S.D.Miss., Sept. 29, 1971), * * *" 122 Cong.Rec. H 12163 (October 1, 1976, daily ed.) (remarks of Congressman Fish).

the various defendant state agencies and state agency officers.

We find, however, that no such clear legislative intent is present in the history of § 1981.[8] Indeed, the Fifth Circuit in remanding this case, stated

> Before we would read an abrogation of the Eleventh Amendment by Congress into legislation, even assuming that Congress could constitutionally accomplish such an end, we would seek clear evidence of such an intent, such as is present in the 1972 amendments to Title VII. Because we do not find such a clear intent in Title IX or in §§ 1981 or 1983, we need not consider the issue of whether Congress could accomplish such a result.

*Wade v. Miss. Cooperative Extension Service*, 528 F.2d at 521.

■ If a § 1981 back pay action against a state defendant is barred by the Eleventh Amendment, a suit against the defendant state's officers sued in their official capacities is likewise barred. Even though the suit may be drawn in terms of a suit against the officers, it is well settled that when an action seeks money damages which would be satisfied out of a state treasury, the state is a "real party in interest" and is entitled to invoke its Eleventh Amendment immunity. *Ford Motor Co. v. Treasury Dept. of Indiana*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389, 394 (1945); *Hander v. San Jacinto Junior College*, 519 F.2d 273 (5 Cir. 1975).

■ Having determined as a general principle that a § 1981 damages action against a state defendant and its officers in their official capacities is barred by the Eleventh Amendment, it must be decided whether the defendant entities here—the Board, MSU, and MCES—are such agencies of the state that the state is in fact the real party in interest. This court has previously held that the Board and MSU are shielded

by the Eleventh Amendment from a suit seeking monetary relief, *Jagnandan v. Giles*, 379 F.Supp. 1178 (N.D.Miss.1974) (three-judge court). There we noted that "refunds [of tuition charges], if ordered, would not be paid by the defendants from personal funds, but would necessarily be a charge upon the state treasury, or at least that portion of the fisc dedicated to higher education," 379 F.Supp. at 1188. If the Board and MSU are entitled to the protection of the Eleventh Amendment, it is only logical to conclude that MCES is likewise afforded immunity, for MCES is merely an operating division of MSU organized and controlled by the Board, Miss.Code Ann. § 37–113–19 (1972).

Plaintiffs contend that our decision on the Eleventh Amendment Issues in *Jagnandan* is inconsistent with the Fifth Circuit's result in *Hander v. San Jacinto Junior College, supra*. *Hander* establishes that the question of whether a governmental entity is so related to the state as to make the state a "real party in interest" in litigation seeking money damages from the entity must be decided on an ad hoc basis after examining "the powers, characteristics and relationships created by state law" concerning the particular entity in question. 519 F.2d at 279. The Fifth Circuit, however, recently affirmed us in *Jagnandan*, holding that under the statutory and decisional law of Mississippi, the state is the real party in interest in an action against the Board and MSU. *Jagnandan v. Giles*, 538 F.2d 1166 (5 Cir. 1976). The Fifth Circuit expressly rejected plaintiffs' present contention that MSU's sue-and-be-sued power operates as a waiver of Eleventh Amendment immunity, finding an absence of clear legislative intent required for such waiver.

■ We must reject the contention that a judgment for back pay against these defendants would not be barred by the Eleventh Amendment if payable from funds

---

8. Plaintiffs also sue directly under the Fourteenth Amendment, asserting general federal question jurisdiction under 28 U.S.C. § 1331. Under a *Bitzer* analysis, if a statute enacted pursuant to the enforcement provisions of the Fourteenth Amendment does not abrogate a

state's Eleventh Amendment immunity absent a clear Congressional intent to destroy the immunity, *a fortiori*, the Fourteenth Amendment standing alone does not abrogate Eleventh Amendment immunity. *Jagnandan v. Giles*, 538 F.2d 1166 (5 Cir. 1976).

emanating from private contributions or federal grants, income generated from sales of timber or mineral leases on federally-granted state lands held in their names, or other similar non-appropriated funds. Albeit such payment would not be literally out of the general treasury, payment of damages from any source of funds—assuming the court could properly authorize such a payment—would directly deplete the funds otherwise utilized by these nonautonomous, nonprofit state agencies in performing their important governmental, nonproprietary functions. We think *Edelman* prohibits an award of damages to be satisfied out of state-held funds of this type. Indeed, the defendant state agency, in *Edelman*, administered grants of federal funds which could have been utilized to satisfy the award of retroactive benefits sought in that case. 415 U.S. at 673, 94 S.Ct. 1347, 39 L.Ed.2d at 678. It may be fairly presumed that the Supreme Court recognized any exhaustion of the state-held federal funds would have had the practical effect of depleting the state treasury.

Furthermore, the Fifth Circuit in *Jagnandan* acknowledged that a recovery of damages from any state-held funds, regardless of their source, would necessarily violate the Eleventh Amendment. Addressing the narrow issue of restitution of excess tuition fees unconstitutionally extracted from resident alien students, the Fifth Circuit reasoned:

> The Eleventh Amendment was fashioned to protect against federal judgments requiring payment of money that would interfere with the state's fiscal autonomy and thus its political sovereignty. Retroactive monetary relief for the constitutional violations here would have just that effect. Mississippi has devised a complex statutory design which governs the state's schools of higher education and their control by the Board of Trustees. The Board is required to submit budgetary proposals for legislative acceptance. To require refund payments from the Board for overpayment of tuition fees would be the kind of tampering

the Eleventh Amendment sought to avoid.

> These fees appear to have been commingled with all moneys held by the University. Moreover, these types of fees were factored into the preparation of the annual budget for M.S.U. and were relied upon by the state legislature in determining the maximum amount of expenditures allowed. To compel payment would be to add an expenditure not figured in the budget.

*Jagnandan*, supra at 1176. No less than tuition fees, self-generated income and federal grants are commingled with other funds held by the Board, MSU, and MCES, and these moneys are taken into account by the state legislature in determining the appropriations necessary for the operation of these educational bodies. To compel payment out of these funds would inevitably interfere with the state's fiscal autonomy, and thereby violate the proscriptions of the Eleventh Amendment.

### B. County Defendants

For the reasons set out in the preceding section of this opinion, the portion of this suit seeking an award of back pay from the individual members of the Board of Supervisors of Holmes County in their official capacities is to be treated as a suit against the Board of Supervisors, a unit of county government. In *Edelman,* the Supreme Court noted that a county is not in the same position as a state in regard to Eleventh Amendment immunity. In this circuit,

> post-*Edelman* cases involving actions for retrospective monetary relief against county school boards and similar entities have held that the Eleventh Amendment does not bar such awards so long as the entities sued are locally controlled, essentially local in character, and the funds to defray the award would not be derived primarily from the state treasury.

*Campbell,* supra, at 656. See, e. g., *Adams v. Rankin County Board of Education,* 524 F.2d 928 (5 Cir. 1975); *Hander, supra.* Clearly the county board of supervisors is locally controlled and essentially local in character. For example, members are

elected by the voters of the county they serve, Miss.Code Ann. § 19–3–1 (1972) and, after elected, may be compelled, by petition of 25% of the county electorate, either to pass orders putting proposals relating to matters of countywide interest into effect, or to submit such proposals to a referendum, and upon approval by referendum, to order such proposals into effect, id. § 19–3–55. It has the sole power to direct the appropriation of funds from the county treasury, id. § 19–3–59, and the power to levy such taxes, not inconsistent with state restrictions, as they deem necessary to meet the needs of the county, id. § 19–3–41. The board further has the authority to maintain county buildings and roads, and to exercise police power over the county. Id. It has the authority to employ counsel, and to direct litigation in cases in which the county is interested, id. § 11–45–15 and § 19–3–47 (Supp.1975). And any damages awarded against the board would necessarily be satisfied from purely local funds.

In light of these characteristics and powers, a suit against the board of supervisors does not implicate the state as a real party in interest, and such board, for purposes of Eleventh Amendment immunity, is an independent political entity distinct from the state. Thus, there is no prohibition of an award of back pay under § 1981 against the board members sued in their official capacities. Defendant board members' argument that they are entitled to the good faith qualified immunity discussed *infra* is without merit in this context; that immunity applies only to a government officer sued in his individual capacity, i. e., where he would be personally liable for any money judgment entered against him.

### IV. Good Faith Immunity of Individual Defendants

Several of the individual defendants in this action are sued not only in their official capacities as officers of the various defendant governmental entities, but also in their individual capacities, seeking to subject them to personal liability on the awards of back pay to plaintiffs Lindsey and Wade.

The officials thus sued in their individual capacities include M. M. Roberts, President of the Board of Trustees; E. E. Thrash, Executive Secretary of the Board of Trustees; William L. Giles, President of Mississippi State University; W. M. Bost, Director of MCES; and Dutch Farmer, Grady Ellis, Oscar Rogers, D. C. Conn, and Bradford Taylor, members of the Board of Supervisors of Holmes County. Defendant Bost had "the direct responsibility for staff organization, selection, assignment, promotion, and transfer of personnel, preparation and presentation of budget requests, overall program development and development of policies relating to employment. In addition to hiring state, district, and area personnel, the director recommends to the county boards of supervisors the employment of county extension workers," *Wade v. MCES,* 372 F.Supp. at 131. Since MCES operates under the aegis of MSU, Bost was generally responsible to Giles, President of MUS; the Board of Trustees in turn exercised over-all control over MSU, along with the seven other state universities.

Thus Bost was the only one of the individual defendants actively participating in the employment practices and decisions of the MCES. There was no proof presented at trial that the named individual defendants, other than Bost, either practiced, approved of, acquiesced in, or had knowledge of a policy of racial discrimination with the MCES. These defendants merely relied upon Director Bost's personnel decisions based upon the ostensibly nondiscriminatory promotion and pay practices designed and implemented by Bost. Any theory of personal liability of the individual county supervisors is especially tenuous; their control over MCES employment practices relating to professional employees is limited to appointment of persons recommended by the Director of MCES and approved by the USDA to fill the positions of county agent, assistant county agent, and home economist. Miss.Code Ann. § 19–5–63 (1972). Obviously it would be inequitable to hold the members of the Board of Supervisors personally liable for appointing to these po-

sitions only those persons they were permitted by statute to appoint.

We think the essential elements of personal involvement and responsibility for the actions complained of, necessary to subject a public officer to individual liability for infringement of a complaining party's constitutional rights, are not present as to the individual defendants other than Director Bost. *See, e. g. Chestnut v. City of Quincy,* 513 F.2d 91 (5 Cir. 1975); *Floyd v. Trice,* 490 F.2d 1154 (8 Cir. 1974); *Johnson v. Glick,* 481 F.2d 1028 (2 Cir. 1973), *cert. denied* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1974); *Bogard v. Cook,* 405 F.Supp. 1202 (N.D.Miss.1975). Even if these defendants could be said to be partially responsible for MCES' racially discriminatory employment practices, we think they are shielded from personal liability to the plaintiffs' discriminations under the good faith immunity afforded government officers by recent decisions of the United States Supreme Court.

Recent precedent has broadened the qualified immunity available to public officials who are accused of constitutional wrongs while exercising discretionary duties within the scope of their authority. "These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation [is] dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity . . ." *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). "To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school [official], who has voluntarily undertaken the task of supervising the operation of the school

and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, *but also on knowledge of the basic unquestioned constitutional rights of his charges.* Such a standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system." [Emphasis added]. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 1000–01, 42 L.Ed.2d 214 (1975).

*Schiff v. Williams,* 519 F.2d 257, 261 (5 Cir. 1975). The test to be applied in determining a public officer's entitlement to the qualified good faith immunity as set forth in the above cases consists of two elements: (1) the officer must have taken the actions in question in subjective good faith—in his own mind he must have believed that he was acting properly; and (2) his actions must have been taken in objective good faith—they must appear to be reasonable when measured against settled precedent at the time they were taken.

There was no proof presented that the individual defendants other than Bost took any actions related to MCES employment practices other than in subjective good faith. The same is true as to objective good faith; the approval by these defendants of the established employment practices and policies of the MCES cannot be said to have been objectively unreasonable in light of the state of the law concerning public employment practices at the times relevant to this action. These individuals are thus immune to liability for either back pay or attorney fees.

Director Bost, however, stands in a position different from these other individual defendants. As pointed out above, he was *the* individual directly involved in and responsible for the employment practices and decisions of the MCES. The question becomes, then, is Bost entitled to *Scheuer-Wood* qualified immunity from liability for the award of back pay to which

**1260**

plaintiffs Wade and Lindsey are entitled. We think he is not. By his own admission, The director and other state personnel conceded that there were black employees qualified to be county agents or extension home economists, some with equal or more experience and with equal or more education than that held by white appointees; a practical obstacle to their appointment during this interval of time [1965 to 1970] was the announced or known opposition of some county supervisors because of race.

*Wade v. MCES,* 372 F.Supp. 126, 133 (N.D. Miss.1974). We found that plaintiffs Wade and Lindsey did not receive the promotions in Holmes County "because of the belief that Holmes County was not ready to accept a black county agent" or home extension economist, 372 F.Supp. at 138–39. They were the victims of a policy of discrimination which was known to and acquiesced in, if not established by, Bost. Bost clearly did not think he was acting fairly and objectively in routinely recommending whites for appointment in counties where he felt black professionals would not be accepted; instead, he felt the harmonious functioning of the MCES was more important than equal opportunity for blacks in the agency. But it has for many years been the law of the land that neither community hostility nor local customs are justification for denying blacks the equal treatment mandated by the Equal Protection Clause, *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Director Bost's actions, in part responsible for the failure of Wade and Lindsey to receive the promotion in Holmes County, were taken neither in subjective or objective good faith, and he is personally liable to them for at least a portion of the back pay award.

V. Realignment of the Federal Parties

The Court of Appeals made the point that the district court made no factual findings as to the role of the Secretary of the United States Department of Agriculture (USDA) and the Administrator of the Federal Extension Service (ES–USDA) in the discriminatory practices of MCES prior

to their realignment as plaintiffs. The Fifth Circuit emphasized that these federal parties should not be insulated from liability for back pay or other monetary obligation merely because the United States Attorney General decided to intervene in the case and to procure realignment of the federal defendants as parties plaintiff, taking "identical positions [to correct racially discriminatory employment practices] with that of the United States." This position was, of course, diametrically opposed to the denials of discrimination first interposed by the federal defendants prior to intervention. We thus find it necessary to consider the extent and nature of the participation by the federal defendants in countenancing or approving discriminatory employment practices maintained by MCES. To the extent that USDA and ES–USDA did acquiesce or participate in, and not effectively object to, discriminatory employment practices being carried out by Dr. Bost as MCES' Director, equity may require that those defendants, no less than Dr. Bost, be charged with a proportionate share of legal responsibility for impermissible, unconstitutional conduct of MCES. The federal defendants, through funding programs and other means, were in position to have brought about an early cessation of discriminatory practices; they had the positive duty under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., to insure the elimination of such discriminatory practices.

The court will, accordingly, reopen the case and schedule an evidentiary hearing addressed to the issue of liability on the part of the federal defendants for back pay and attorney fees. Under these unique circumstances, separate representation of USDA and ES–USDA by counsel disassociated from the office of the Attorney General of the United States becomes appropriate, particularly since the Department of Justice continues to press for back pay relief for such persons as may be adjudged to be entitled thereto.

We withhold the entry of final judgment pending further evidentiary hearing, with

findings of fact and conclusions of law as to whether the Secretary of the United States Department of Agriculture and the Administrator of the Federal Extension Service were properly realigned as plaintiffs or should remain as defendants and be subject to a proportionate measure of liability on back pay and attorney fee awards to which plaintiffs are entitled because of MCES' racially discriminatory practices as have heretofore been found to exist.

Let an order be issued accordingly.